[No. D006245. Fourth Dist., Div. One. Mar. 8, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
VICENTE BRETATO SANCHEZ, Defendant and Appellant.

**COUNSEL**

Gary Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Rudolf Corona, Jr., and Roy W. Hewitt, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TODD, J.**—A jury found Vicente Bretato Sanchez guilty of 10 counts of child molesting under Penal Code[1] section 288, subdivision (a) (counts 1-6, 9, 12, 15 and 18), 5 counts of child molesting with duress under section 288, subdivision (b) (counts 7, 10, 13, 16 and 19),[2] and 5 counts of oral copulation with a person under 14 and more than 10 years younger than the defendant under section 288a, subdivision (c) (counts 8, 11, 14, 17 and 20). As to all of the counts under section 288, subdivision (a), it was alleged and the jury found true that Sanchez occupied a position of special trust and engaged in substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(9), relating to ineligibility for probation. As to the first two counts under section 288, subdivision (a), it was alleged and the jury found true that Sanchez had substantial sexual contact with a child under 11 within the meaning of section 1203.066, subdivision (a)(8), also relating to ineligibility for probation.

The trial court sentenced Sanchez to 40 years in prison. He appeals, asserting 11 major points of error on several subjects including jury selection, admission of evidence, particularly evidence pertaining to the child sexual abuse accommodation syndrome (CSAAS) and the hysterical response syndrome, effectiveness of counsel, instructions included or omitted and his motion for a new trial. Finding no reversible error, we affirm.

### FACTS

Sanchez's granddaughter, C, who was born in 1974, is the victim. The information charges Sanchez with offenses occurring during various time periods commencing September 16, 1982, the last of which ended December 31, 1985. Generally, the time periods correspond to school semesters and intervening summer vacations while C was attending the second, third, fourth and fifth grades. The allegations speak in the singular when describing the particular violation alleged for each period. The place of the crimes was Sanchez's home where C, her mother and numerous other relatives lived during the relevant time periods.

Describing the allegations in more detail, as we have mentioned, the case was presented in a context of each violation of a statute having been committed during a specified time period. For example, the child molesting charges under section 288, subdivision (a), in the first five counts were alleged to have been committed "[o]n or about and between," respectively,

---

[1] All statutory references are to the Penal Code unless otherwise specified.
[2] At sentencing the trial court set aside the guilty verdict on count seven.

September 16, 1982, and January 15, 1983; January 16, 1983, and June 15, 1983; and in similarly described later time periods up to June 15, 1984.

Beginning with count six, each of the three statutory violations, i.e., section 288, subdivision (a), section 288, subdivision (b), and section 288a, subdivision (c), was alleged in a separate count to have occurred in the same described time period. For example, in counts six, seven and eight, respectively, each of the three statutory violations was alleged to have occurred "[o]n or about and between" June 16, 1984, and September 15, 1984. A similar charging pattern followed, with the last time period in which the three violations were alleged to have been committed being "[o]n or about and between the dates of September 16, 1985, and December 31, 1985." (Counts 18, 19 and 20.)

C's testimony included estimates of the number of times she was molested. In her direct testimony, C described the frequency the acts occurred during the various time periods in general terms such as "many times" or "lots of times." During cross-examination, she estimated Sanchez molested her 50 to 60 times between September and December 1982; more than 60 times between January and June 1983; more than 100 times during her third grade school year from September 1983 to June 1984; 60 times in July and August 1984; 60 times during her fourth grade school year from September 1984 to June 1985; 60 times during the summer of 1985; and 60 times from September through December 1985.

Using terminology defined for the jury by the use of anatomically correct male and female dolls, C's testimony described the acts of molestations in sufficient terms to bring those acts within the violations charged. Generally, her testimony was the acts were carried out in the garage or a bedroom of Sanchez's house usually after she returned home from school and before Sanchez went to work. She said there always was a blanket covering a window on the garage door facing a neighbor's house and the doors in the garage could be locked from inside the garage. Sanchez always locked the doors when he molested her in the garage.

Normally when the crimes were committed, C would be standing by the sofa bed in the garage, either he or she would remove her clothes and he would lower his pants before molesting her. When Sanchez finished he gave C 25 cents or a dollar. More than once Sanchez told C if she told anyone her mother was going to hit her and he would go to jail. C never told anyone about the molestations because she was afraid her mother was going to hit her.

Sanchez's defense consisted primarily of attacking C's credibility. He denied committing any of the offenses. He sought to establish he had left for

work before C returned from school and thus could not have committed the offenses at the times she indicated. Further, his defense contradicted details of C's testimony concerning such things as the presence of a blanket over a garage window through which the interior could be viewed from a neighbor's home and the presence of a lock that could be latched from inside the garage to prevent entry to the garage from the house.

## DISCUSSION

## I

Sanchez contends the trial court committed reversible error in refusing to grant his challenge for cause of prospective juror Wilkinson and in not adequately examining the prospective jurors to insure selection of a fair and impartial jury. The argument is without merit.

After answering "no" to a question in a questionnaire asking whether she had anything in her mind that would make it difficult or impossible to act fairly and impartially both as to the defendant and the People, prospective juror Wilkinson stated during voir dire that she had never been a juror "and I probably would be partial in this case." In chambers the following colloquy occurred:"The Court: All right. [¶] Why don't you think you can be fair?

"Prospective Juror Wilkinson: I'm very emotional when it comes to children, and I don't think I would be able to keep myself emotionally stable in a case like this.

"The Court: You may sit down. [¶] Any questions?

"Mr. Castillo [defense counsel]: Do you have children of your own?

"Prospective Juror Wilkinson: No.

"Mr. Castillo: Do you know any children that have been abused or sexually abused in any way?

"Prospective Juror Wilkinson: My nephew was not sexually abused, but he was abused as a child and I'm very, very close to them.

"Mr. Castillo: How old is your nephew now?

"Prospective Juror Wilkinson: He's now 13.

"Mr. Castillo: Have you discussed with his parents or anyone involved in that case the facts of that case?

"Prospective Juror Wilkinson: Yes.

"Mr. Castillo: Because there is a child victim in this case, would you be more partial to believe the testimony of the child as opposed to other witnesses or the defense?

"Prospective Juror Wilkinson: I—I wouldn't know unless I—I would base it on the evidence, but I probably would, you know, like I say, the emotional part that I wouldn't be able to handle.

"Mr. Castillo: Nothing further, your Honor.

"Ms. Avery [prosecutor]: Do you see yourself as a fair person?

"Prospective Juror Wilkinson: Yes.

"Ms. Avery: Have you been called upon to make judgments before where you had to listen to two different sides of a story?

"Prospective Juror Wilkinson: Oh, yes.

"Ms. Avery: Did you feel it was important to hear both sides of the story before you made a decision?

"Prospective Juror Wilkinson: Yes, always.

"Ms. Avery: Do you agree that children can be victims of this kind of crime?

"Prospective Juror Wilkinson: Sure.

"Ms. Avery: Do you feel that a child who is the victim of an alleged crime of this nature deserves to have someone like yourself seated on a jury?

"Prospective Juror Wilkinson: Sure.

"Ms. Avery: And is there anything specific that is in your background that makes it difficult for you to explain why you would be more emotional with this type of a victim than, say, the victim of other types of crime?

"Prospective Juror Wilkinson: Being with children, yes, that would be the only reason.

"Ms. Avery: When you say, 'Being with children,' meaning with relatives and through babysitting and things like that?

"Prospective Juror Wilkinson: Right, exactly.

"Ms. Avery: Do you feel it would be possible for the People of the State of California to give a fair trial in a case like this if we were to excuse all of the people who have sensitivities towards children?

"Prospective Juror Wilkinson: No.

"Ms. Avery: Do you feel that could be a problem?

"Prospective Juror Wilkinson: No.

"Ms. Avery: No further questions, your Honor.

"The Court: All right. You may return to your seat.

"Mr. Castillo: I would move to challenge for cause, your Honor.

"The Court: I don't really see a cause here. She didn't say she would be unfair or unbiased [*sic*] or prejudiced. She just doesn't want to sit because she thinks it will be an emotional experience. Jury service is an emotional experience for a lot of people.

"Mr. Castillo: But she did indicate she was probably partial to the children's side—

"The Court: I thought she answered that very neutrally. She said she would have to wait and see what the evidence was. I didn't gather that she was going to lean in favor of the child simply because it's a child. So, you see the difficulty is if you let people off the jury because they don't want to sit in the case for whatever reason—they're uncomfortable because it will take too long or they don't like the type of crime or whatever, you would never pick a jury. It's only if they're biased or in any way could be other than unprejudiced in their opinion or unable for some reason to render one.

"I don't gather that with Miss Wilkinson, so I'm going to leave her on."

At the time Sanchez challenged Wilkinson for cause, he had not used any of his peremptory challenges. Later he used a total of 12 peremptory chal-

lenges, 10 under section 1070, subdivision (a), and 2 additional challenges allowed by the court. He objected to no other jurors involved in the voir dire process, passing for cause 14 times after the Wilkinson chambers conference.

Because we uphold the trial court's determination there was no cause to discharge Wilkinson, we need not address the parties' argument about whether, in light of the fact Sanchez had peremptory challenges available when he challenged Wilkinson for cause, he preserved the Wilkinson issue for this appeal. (See § 1088; *People* v. *Riggins* (1910) 159 Cal. 113, 119-120 [112 P. 862]; *People* v. *Slaughter* (1917) 33 Cal.App. 365 [165 P. 44]; *People* v. *Lee* (1905) 1 Cal.App. 169, 171 [81 P. 969].)

■ The conduct of the voir dire and the qualification of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal. (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225].) "To find actual bias on the part of an individual juror, the court must find 'the existence of a state of mind' with reference to the case or the parties that would prevent the prospective juror 'from acting with entire impartiality and without prejudice to the substantial rights of either party.' (Pen. Code, § 1073.)" (*Ibid.*) The trial judge's resolution of any conflict in the prospective juror's testimony is binding on the appellate court. (*People* v. *Carter* (1961) 56 Cal.2d 549, 574 [15 Cal.Rptr. 645, 364 P.2d 477].)

■ Here, Wilkinson's answers to questions going to her partiality were in conflict or susceptible to that interpretation. This is particularly true of her answer to the question whether she would be partial to the testimony of the child as opposed to other witnesses, i.e., that she "would base it on the evidence" and that she "probably would." She also said that she agreed it was important to hear both sides of the story before making a decision.

Under these circumstances the trial court properly declined to excuse Wilkinson for cause and we are bound by the court's determination.

■ On the matter of the trial court's efforts to ensure a fair and impartial jury, this too is left to the sound discretion of the court. (§ 1078,[3] *People* v. *Crowe* (1973) 8 Cal.3d 815, 819, 828 [106 Cal.Rptr. 369, 506 P.2d 193].) Here, the trial court comported with the terms of section 1078 by requiring

---

[3] As it read when the jury voir dire in Chavez's case was being conducted, section 1078 read: "It shall be the duty of the trial court to examine the prospective jurors to select a fair and impartial jury. He shall permit reasonable examination of prospective jurors by counsel for the people and for the defendant, such examination to be conducted orally and directly by counsel." (Now Code Civ. Proc., § 233.)

the prospective jurors to answer written jury questionnaires, by itself and through counsel examining in chambers any jurors who indicated potential bias and by permitting counsel to voir dire the prospective jurors. The examples Sanchez brings to our attention as demonstrations of "a voir dire process counterproductive to the selection of an impartial and fair jury" consist of expressions of the court's apparent frustration in finding so many jurors subject to valid challenges for cause.[4] Our reading of the record does not support Sanchez's characterization of the court's approach. There was no abuse of discretion in the court's examination of the prospective jurors during voir dire to select a fair and impartial jury.

## II

Sanchez contends the trial court committed reversible error when it denied his motion to exclude testimony concerning CSAAS and permitted the prosecution to present that testimony as part of its case-in-chief.

The second to last witness in the prosecution's case-in-chief was Stuart Ludwig, Ph.D., a licensed psychologist. Sanchez asked for and was granted a conference in chambers where he recited he realized the court had ruled preliminarily on the admissibility of Ludwig's testimony, stated his objection to the testimony under Evidence Code section 352 and requested an evidentiary hearing on Ludwig's qualifications under Evidence Code section 352. The prosecutor noted she had filed points and authorities setting forth the CSAAS subject of Ludwig's testimony and pointed out Ludwig "is not being called to give any type of diagnosis of the child victim in this particular case."

---

[4] The examples Sanchez points out to us are stated in his opening brief as follows: "[W]hen prospective juror Caldeira candidly stated that she tended 'to go more towards the victim' particularly in child sexual abuse matters, and repeatedly indicated she felt she could not be impartial, the court told Ms. Caldeira: [¶] 'All right. I'm going to excuse you. The unhappy part about all of this is if you were charged with a crime and you wanted some jurors to sit in your case and they came up and said, no, I will feel so distraught about purse-snatches that I'm not going to sit in this case, you might not be able to pick a jury, and it's too bad. . . .' (RT Voir Dire, 30-33.) Similarly, later in voir dire, the trial court instructed the prosecutor not to ask a particular juror (Centeno) any more questions, stating, '[i]f you want him kicked off, let's kick him off and get on with the case' and added, 'I don't intend to kick him off, because if I do, we don't have a juror left.' (RT I, Voir Dire, p. 83.) The court excused another juror who had explained that, because of his religious beliefs (Jehovah's Witness), he could not sit as a juror in the case, then gratuitously told him: '[I] guess the devine (*sic*) plan is that some people are put on this earth to impede and some are put on to assist. . . .' (RT I, Voir Dire, p. 164.) Upon becoming exasperated with a prospective alternate juror's apparently honest expression of confusion over what evidence might be required for 'proof beyond a reasonable doubt', which concern had been checked on his questionnaire, the court excused the prospective juror with the comment: 'Mr. Wells, I don't understand you and I don't understand your thinking and there is no way that people of the United States could have jury trials and live by the Constitution if they all felt that way. I don't understand it, but it's a matter that you don't serve.' (RT I, Voir Dire, 286-288.)"

After further discussion about Ludwig's qualifications as an expert, the trial court denied Sanchez's request for an Evidence Code section 402 hearing, advised him he could conduct voir dire in front of the jury and noted the court would have to be satisfied Ludwig was qualified before he would be allowed to testify. Ludwig took the stand and stated his qualifications. After asking five questions of Ludwig on voir dire, Sanchez stipulated to Ludwig's expertise. The prosecutor proceeded to ask Ludwig to answer all of her questions in reference to child sexual abuse victims as a class or a group. Ludwig's answers complied with this request as he went on to describe symptoms and characteristics of CSAAS, i.e., secrecy, helplessness, entrapment and accommodation, delayed conflicted disclosure and retraction.

Sanchez argues there are no less than four reversible errors encompassed in the testimony concerning CSAAS. First, he asserts it is inadmissible because it did not meet the *Kelly-Frye* standard of reliability for new scientific methods of proof. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145].) Under the *Kelly-Frye* test scientific techniques utilized by an expert witness must be sufficiently established to have gained general acceptance in the particular field in which it belongs. (*Ibid.*)

Before Sanchez's trial, courts had held an expert is precluded from testifying based on CSAAS that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics which are generally exhibited by abused children. (See, e.g., *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1099-1101 [215 Cal.Rptr. 45]; *People* v. *Willoughby* (1985) 164 Cal.App.3d 1054, 1069 [210 Cal.Rptr. 880].)

After the trial of Sanchez's case, courts determined the *Kelly-Frye* test is applicable to testimony of an expert on CSAAS even where it is not used to rebut defense allegations of incredibility but instead matches the descriptions of other witnesses about the victim's behavior and statements thus demonstrating the existence of the symptoms of the syndrome in this particular victim. (See *In re Sara M.* (1987) 194 Cal.App.3d 585, 591-592 [239 Cal.Rptr. 605]; see also *Seering* v. *Dept. of Social Services* (1987) 194 Cal.App.3d 298, 309-311, 313 [239 Cal.Rptr. 422].)

More recently, this court too has recognized the *Kelly-Frye* rule applies to expert testimony on CSAAS. In *People* v. *Bowker* (1988) 203 Cal.App.3d 385, 391-394 [249 Cal.Rptr. 886], this court held that *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] and the *Kelly-Frye* test preclude the admission of CSAAS evidence to prove that a child has

been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. However, applying an exception identified in *Bledsoe,* we held such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse. (*People* v. *Bowker, supra,* 203 Cal.App.3d at p. 393.) *Bowker* prescribed two requirements to the admissibility of CSAAS evidence: **(5)** First, the expert's testimony must be narrowly tailored to the purpose for which it is admissible, i.e., the prosecution is obligated to "identify the myth or misconception the evidence is designed to rebut" and the testimony must be limited to exposing the misconception by explaining why the child's behavior is not inconsistent with his or her having been abused. (*Id.* at p. 394.)

Second, if requested the jury must be admonished "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (203 Cal.App.3d at p. 394, original italics; see *People* v. *Bothuel* (1988) 205 Cal.App.3d 581, 587-588 [252 Cal.Rptr. 596].)

■ Here, although Ludwig's testimony concerning CSAAS was presented during the prosecution's case-in-chief, it followed the testimony of C whose direct testimony presented a detailed account of various acts of molestation occurring "lots of times" or "many times" during the various time periods covering more than three years before C reported the molestations. Sanchez's cross-examination attacked her credibility, including bringing out such matters as the prosecutor and C practiced C's testimony for the trial by going over C's preliminary examination testimony, that C first heard the anatomical terms she used in her testimony while she was in the fourth grade, that the molestations occurred a specific number of times, usually 60 times, during each of the time periods alleged, that C reported the molestations first to her aunt rather than her mother because her mother was "going to hit me" though she never before had hit C, and that C never once told a lie. At one point with reference to a statement C had made to an officer about seeing an aunt two years older than C in bed with Sanchez who had his pants off, Sanchez asked C, "That wasn't true, was it?"

As in *People* v. *Gray* (1986) 187 Cal.App.3d 213, 217-221 [231 Cal.Rptr. 658], and as is pointed out by Justice Benke in her concurring opinion in *People* v. *Bowker, supra,* 203 Cal.App.3d 385, at page 401, the CSAAS testimony was rehabilitative and thus pertinent to the question of the victim's credibility. Accordingly, it was unnecessary for the testimony to await

the rebuttal stage of trial to be presented. Due to the cross-examination of C during the prosecution's case-in-chief, the credibility issue was already fully present in the case and the rehabilitative evidence on this issue was appropriately admitted.

Even assuming that under *Bowker* and *Bothuel* the court erred in admitting the CSAAS expert testimony because there was no showing by the prosecution of an identified myth or misconception the evidence was designed to rebut, as in both *Bowker* and *Bothuel,* the error does not require a reversal. C's detailed testimony concerning the nature of the acts of molestation was corroborated by the testimony of board-certified pediatrician, Dr. Sylvia Strickland, who described C's physical condition as having a scar tissue band and two disruptions of her hymen likely representing old tears of the tissue formed by multiple event abrasion consistent with sexual molestation and not other daily living activities. Moreover C's mother described several incidents of seeing Sanchez touching C in ways having a sexual connotation.

Considering the foregoing evidence, there is no reasonable probability of a different result had the assumed error not occurred. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Bothuel, supra,* 205 Cal.App.3d 581, 588-589; *People* v. *Bowker, supra,* 203 Cal.App.3d 385, 395.)

On the matter of Ludwig's qualifications, there is no merit to Sanchez's arguments Ludwig did not qualify as an expert to give an opinion on CSAAS and his counsel's stipulation to Ludwig's expertise constituted argument against his client's case and ineffective assistance of counsel. The record discloses ample grounds for the trial court's having permitted Ludwig to testify as an expert based on the education and experience Ludwig cited in his direct testimony elicited by the prosecutor and his voir dire testimony elicited by Sanchez.

For eight years Ludwig had been a member of the Sexual Abuse Review Committee of the San Diego Community Child Abuse Coordinating Council, he was a past member of the executive committee of that council and he had taught and written substantially on the subject of child abuse. When on voir dire Sanchez established that Ludwig had treated between 150 and 200 child abuse victims, 50 to 60 percent of whom were victims of sexual abuse, Sanchez announced he stipulated to Ludwig's expertise. On further direct testimony, Ludwig displayed he had detailed knowledge of CSAAS.

On this record there is no basis for claiming Ludwig was not qualified as an expert able to testify on CSAAS. Moreover, it is readily apparent that

Sanchez's stipulation to Ludwig's qualifications was a tactical decision calculated to avoid further display of Ludwig's expertise to the jury.

In light of the conclusions we have reached on the subject of the expert testimony about CSAAS and the record showing Sanchez's stipulation to Ludwig's qualifications, it is unnecessary to further discuss Sanchez's separately stated arguments that there was error in admitting the testimony because it was not rehabilitative of C's credibility and the trial court abused its discretion in refusing to grant Sanchez's request for an Evidence Code section 402 hearing.

### III

■ Sanchez contends introduction of testimony concerning the "hysterical response syndrome" in its case-in-chief with no foundational proof was so prejudicial to his right to a fair trial as to require reversal of the conviction. The argument lacks merit.

Before Ludwig was called and the chambers conference was held concerning Sanchez's objection to his testimony, several witnesses presented their observations that C had experienced a long-term hoarseness which disappeared after she reported the molestation. Near the close of the chambers conference the prosecutor stated: "The only other thing that is unusual in this case that I have asked him about is the Hysterical Response Syndrome, and I asked him if there was any significance whatsoever to a child losing her voice for two years and then having it, you know, return upon disclosure of this; and he said that that is a classic symptom of the Hysterical Response Syndrome. I feel that as a psychologist, he certainly is qualified to discuss that particular syndrome. That is just a very brief two-minute piece of testimony that would refer to the hoarseness of the voice that we have had ample testimony provided in the case so far on."

Sanchez made no objection. Then during Ludwig's direct testimony, the following colloquy occurred between the prosecutor and Ludwig: "Q. Have you ever heard of the Hysterical Response Syndrome?

"A. Yes.

"Q. What is the Hysterical Response Syndrome?

"A. Well, if you're speaking about hysteria, which was studied by Freud, it is a pattern of responses to conflicted feelings that manifest themselves in behavioral patterns in manifestations of illnesses, physical illnesses. Classic cases involved paralyses that were functional paralyses. That is that they

were not physiological but rather the consequence of psychological trauma which led to paralysis on the individual.

"Q. All right. And can being molested as a child contribute to the development of hysterical responses?

"A. Yes, it can. It's not uncommon for victims of molest to develop physiological manifestations, stomachaches, headaches, somatic complaints, physical complaints.

"Q. Could a child's being molested over a long period of time contribute to the development of something like chronic laryngitis if there was no known physical etiology for the hoarseness or laryngitis?

"A. Yes, it could.

"Q. Would the fact that the condition disappeared soon after the disclosure of the molest be significant in any way from the standpoint of the psychological aspects of it?

"A. Yes. I would think that that would be a diagnostic indicator that the physical problem was related to psychological etiology.

"Q. Could the specific type of sexual activity be significant in any way as it might relate to specifically chronic laryngitis?

"A. It could be. It could be a consequence of oral sexual behavior. [¶] Also laryngitis is an incapacity to speak, and it might also be related to the demand for secrecry [sic] and the desire to breach that secrecy; so the solution is in the symptom. By having—if I can articulate, elaborate on it, by having laryngitis, the individual doesn't have to make the decision to speak. They can't speak; so it releases a psychological burden."

Again, Sanchez made no objection. During his cross-examination Sanchez asked Ludwig an additional question about the hysterical response syndrome.

Since Sanchez did not object to the testimony on the hysterical response syndrome, he did not preserve the issue of the propriety of its admissibility for this appeal. (Evid. Code, § 353, subd. (a).)

His argument that he was denied effective assistance of counsel by the failure of his attorney to object must be answered the same way his conten-

tion about CSAAS was answered. There is no reasonable probability of a different result.

Moreover, it is noteworthy that in *People* v. *McDonald* (1984) 37 Cal.3d 351, 373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], the Supreme Court stated after *Bledsoe, supra,* 36 Cal.3d 236, as follows: "We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association [citation]."

The *McDonald* description of esoteric subject matter applies to the hysterical response syndrome as well as it does to the matter of how everyday experience can affect human perception or memory, the point being discussed in *McDonald*. As Ludwig said, hysteria was studied by Freud. It is a recognized psychological phenomenon. Application of the *McDonald* viewpoint to the hysterical response syndrome evidence under consideration leads to the conclusion an objection by Sanchez would have been futile. Under these circumstances it cannot properly be argued he was deprived of effective assistance of counsel.

## IV

Sanchez contends his counsel's repeated references to the complaining witness as the "victim," and his failure to object to the prosecutor's repeated reference to the complaining witness as the "victim," when the defense theory was that no molestation had occurred, denied him his right to effective assistance of counsel. The argument has no merit.

Most of the references to the complaining witness as the "victim," nine by Sanchez's counsel and seven by the prosecutor, occurred during voir dire. Throughout the remainder of the trial Sanchez's counsel referred to C as the "victim" five times, and the prosecutor made that reference six times.

The use of particular terminology at trial is almost exclusively a matter of tactics or strategy. During voir dire, before the jury was selected, it was appropriate to inquire as to the prospective jurors' experience with and attitudes about a case in which it was then expected the prosecutor would produce evidence there was a child victim, notwithstanding an expected defense theory to the contrary. We find no deficiency in counsels' use of the particular terminology in order to conduct voir dire.

The minor number of times the terminology was used during the actual presentation of evidence can hardly be deemed an abandonment of the client's case, as Sanchez suggests. Rather, Sanchez's counsel's use of the terminology occurred during examination of the investigating officer and apparently reflected counsel's familiarity with the terminology used by the officer in his reports. The scattered references to "victim" made by the prosecutor, though possibly objectionable, did not deserve defense counsel's interruption of the trial.

In any event Sanchez has not shown it is reasonably probable a determination more favorable to him would have resulted in the absence of the use of the "victim" terminology. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) There is no ground for reversal on the basis of the use during trial of the term "victim."

V

■ Sanchez contends he was denied his right to due process of law, to confront and cross-examine and to present evidence in his own behalf when the trial court unreasonably limited his examination of witnesses. The argument is unmeritorious.

Part of the defense theory of the case, known to the prosecutor, was that C was fabricating as a result of her mother forcing her to accuse Sanchez of the molestation. C testified she did not tell anyone of the molestation because Sanchez told her that her mother would hit her and she was afraid this would happen, although her mother never hit her before. C first told Arinda Cabalerro, a girlfriend of one of Sanchez's sons and frequent visitor, about the molestations. Cabalerro testified she had never seen C's mother hit or strike C.

When asked if she had ever hit C, C's mother testified on cross-examination that from 1979 to the date of the trial in February 1987, she had "called her attention to something . . . one or two times." Sanchez's counsel then asked C's mother, "Isn't it true that you used an extension cord to hit [C]?" The prosecutor objected and in an in-chambers conference argued to the court, in part: "[W]hat this is going to open up the door to is not only bringing that child back, but bringing back numerous witnesses who will talk about the love that these two persons, the mother and the daughter, have for each other and have had for years, very credible people in the community. So my feeling is if he wants to open up the door to that, I'm just putting him on notice as to what that starts. And I feel it will help my case."

The trial court sustained the prosecutor's objection, noting the testimony involves going into specifics, and stating it is irrelevant and even if it were relevant "to go into the specifics of it would be to have so much prejudicial material vastly outweigh it's [*sic*] probative value."

The trial court ruled correctly on the basis of the time-consuming and prejudicial nature of a series of conflicting minitrials about mother-daughter bonding and detailing beating methodologies that the evidence would show both did and did not occur. At the point in the case when the trial court ruled, there was little or no evidence of substance that C's mother had hit her. The mother's answer using the expression "called her attention" was ambiguous though reasonably susceptible to the trial court's interpretation it meant the mother was admitting she hit C "a couple of times." Otherwise, there was no affirmative proof about C's mother hitting her, both C and Cabalerro having testified to that effect.

The trial court did not abuse its broad discretion to preclude unduly harassing interrogation. (See *Davis* v. *Alaska* (1974) 415 U.S. 308, 316 [39 L.Ed.2d 347, 353-354, 94 S.Ct. 1105]; *People* v. *Castro* (1985) 38 Cal.3d 301, 307 [211 Cal.Rptr. 719, 696 P.2d 111].) In contrast to cases in which there is improper limitation on cross-examination of a central, crucial witness for the prosecution, for example the complaining witness, and where the cross-examination is designed to show a prototypical form of bias (see *Olden* v. *Kentucky* (1988) 488 U.S. 227 [102 L.Ed.2d 513, 109 S.Ct. 480]), here we have an attempt to examine a secondary witness on matters of minute detail that do not go directly to the main issues of the case, whether the molestations occurred and, if so, whether the defendant committed the molestations. There remained in the trial ample opportunity for Sanchez to establish through other testimony his theory of fabrication through coercion by C's mother.

Under these circumstances there was no violation of Sanchez's rights to due process, confrontation and cross-examination.

## VI

Sanchez contends as to each count he was denied due process of law resulting in prejudicial error when the trial court failed to instruct the jury that it must unanimously agree on the act supporting the conviction. He relies primarily on the testimony he elicited from C as to the number of times each act of molestation occurred, describing the case as one in which "the jury was asked to return verdicts on the basis of an amorphous mass of approximately 60 episodes of oral copulation of appellant by [C], 60 occasions of oral copulation of [C] by appellant and 60 touchings of [C's]

genitalia by appellant per each several month period." He calculates he was "called upon to defend against not less than 1,380 separate offenses—none of which was particularly identified as to a date upon which it was allegedly perpetrated."

Contrary to Sanchez's assertion, the trial court gave a unanimity instruction to the jury, as follows: "In order to find the defendant guilty on any count all the jurors must agree that he committed the same act or acts."

This instruction comports with CALJIC Nos. 17.01 and 4.71.5[5] It was given near the end of the main body of instructions immediately preceding instructions on making findings on lesser included offenses which concluded the court's main body of instructions.[6]

Viewing the instructions as a whole and presuming the jury followed the instructions, as we must (see *People* v. *Burgener* (1986) 41 Cal.3d 505, 538-539 [224 Cal.Rptr. 112, 714 P.2d 1251]; *People* v. *Scott* (1988) 200 Cal.App.3d 1090, 1095 [246 Cal.Rptr. 406]), there is no merit to Sanchez's argument that since the above-quoted unanimity instruction was read immediately after CALJIC No. 10.35, relating to the jury's consideration of evidence of acts of molestation on occasions other than those charged in the case solely for the purpose of showing lewd disposition or intent toward the child, it was merely "tacked" on to that instruction and must have been understood as restricted to the lewd disposition instruction. The argument, though based on the fact the instruction is included in the written instructions on CALJIC No. 10.35 without separate labeling or paragraphing[7] and apparently was delivered to the jury room, is purely conjectural.

[5]The current versions of CALJIC Nos. 17.01 and 4.71.5 (CALJIC 5th ed.), respectively, read: "The defendant is accused of having committed the crime of _____ [in Count _____ ]. The prosecution has introduced evidence tending to prove that there is more than one [act] [or] [omission] upon which a conviction [on Count _____ ] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count _____ ], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict." (CALJIC No. 17.01.)
"Defendant is accused in [Count[s] _____ of] the information of having committed the crime of _____ , a violation of Section _____ of the Penal Code, on or about a period of time between _____ and _____ . [¶] In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act [or acts] constituting that crime within the period alleged. [¶] And, in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act [or acts] constituting the crime within the period alleged. [¶] It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict." (CALJIC No. 4.71.5.)
[6]After counsel argued, the court gave additional instructions on such matters as the duties of the jurors in deliberation and the use of the verdict forms.
[7]The last paragraph of the written instruction in question begins with the last sentence of the standard CALJIC No. 10.35 instruction and concludes with the unanimity instruction. It

There is no evidence the jury limited its consideration of the quoted instruction as having application only to CALJIC No. 10.35 as Sanchez suggests. The court instructed the jury: "I've indicated that the written instructions now being given will be available in the jury room for your deliberations. You must not, of course, deface them in any way.

"You'll find that some of the instructions are printed. Some may be typed, some partially handwritten. Some of them have been modified. There may be blanks which are filled in, and there are parts that are stricken out.

"You're not to be concerned with the reasons for any modifications that have been made. You must disregard any deleted part of an instruction and not speculate as to what it was or the reason for its deletion.

"*Every part of an instruction, no matter what its form, is of equal importance*. You're to be governed by the instruction in its final wording, whether printed, typed, handwritten, or whatever its form." (Italics added.)

Under the language telling the jury every part of the instruction is of equal importance, which we view as having been followed by the jury, there is no basis for Sanchez's argument the jury was not told it was required to reach a unanimous verdict on each act. In this connection, we observe, the prosecutor's argument at one point supported the unanimity instruction by expressing the understanding that unanimity as to one of several acts shown to have occurred during a particular time period was required.[8]

We conclude the record shows the jury was properly instructed on its duty to agree unanimously on the particular act when the evidence shows

---

reads: "You must not consider such evidence for any other purpose. In order to find the defendant guilty on any count all the jurors must agree that he committed the same act or acts."

[8]Discussing the format of the charges in her closing argument, the prosecutor stated, in part: "Now, I've put up here the dates alleged so that you can see the time period that we're dealing with, and I've divided it into second grade, third grade, fourth grade, and fifth grade with the summers in between.

"And when these charges were made in a Complaint against the defendant, we started in the beginning, keeping it simpler, when the child was younger, just using one act. And what this means is that during the time—you've already been instructed that if you agree that on any one day between September 16th, 1982 and January 15th—all that we're alleging during that entire time period is that just once that the defendant—and I relate back to here, and the verdict form will have this on it—*if you believe that just once [C] was required to orally copulate her grandfather during that time and you agree unanimously, then that particular—he can be found guilty of that particular act.* You've heard testimony that it happened more than once, but the defendant can't be found guilty of any acts that are not alleged; and so we're just asking you to make a decision on just one act during that time.

"The same thing, again, in second grade, just talking about one act from—and as you can see, the school year is divided up." (Italics added.)

more than one act was committed. This conclusion removes the case from the possible application of cases such as *People* v. *Martinez* (1988) 197 Cal.App.3d 767 [243 Cal.Rptr. 66], on which Sanchez relies, and places it in the category of cases such as *People* v. *Luna* (1988) 204 Cal.App.3d 726, 737-746 [250 Cal.Rptr. 878], with respect to *Luna*'s treatment of counts VI, VIII and X against Luna.

*Martinez* and *Luna* are but two of a series of recent cases predominantly from the Court of Appeal for the Fifth Appellate District addressing problems of proof and instructions in the resident child molester class of cases. Generally, in the resident child molester class of cases where a unanimity instruction has been given, the Fifth District holds there is a violation of due process and reversible error with retrial barred[9] if the evidence of the several acts of molestation during the relevant time period under the charge does not present a "distinguishing characteristic," i.e., a specific time, date, event or other individualizing aspect. (See *People* v. *Vargas* (1988) 206 Cal.App.3d 831, 845-846 [253 Cal.Rptr. 894]; *People* v. *Luna, supra,* 204 Cal.App.3d 726, 746; *People* v. *Atkins* (1988) 203 Cal.App.3d 15, 19 [249 Cal.Rptr. 863]; *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811, 816 [246

---

[9] The due process concern derives from the following statements in *People* v. *Castro* (1901) 133 Cal. 11, 12-13 [65 P. 13], and *People* v. *Williams* (1901) 133 Cal. 165, 168 [65 P. 323]: "Under the *instructions* given to the jury in the case at bar, the defendant should have been convicted, if any one of the various acts of intercourse sworn to by the prosecutrix was established beyond a reasonable doubt; but, certainly, the defendant was not called upon to defend himself against all of these respective acts of intercourse, extending through a period of several months. The information only charged one act, and upon that allegation the case must stand or fall. Possibly, any one of the acts sworn to by the prosecutrix could have been selected by the state as the act charged in the pleading, but the entire four acts could not be so selected. The state, at the commencement of the trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand upon the part of the defendant to make the election, still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish by the evidence, before a verdict of guilty could be returned against the defendant. This was not done." (*People* v. *Castro, supra,* 133 Cal. at pp. 12-13.)

"Each of these acts was a separate offense, and the defendant could be tried for either, and separately for each of them. The jury were not even told that they must all agree that some specifically described act had been performed. A verdict of guilty could have been rendered under such an instruction, although no two jurors were convinced beyond a reasonable doubt, or at all, of the truth of the charge, as to any one of these separate offenses. Even worse than that was possible. As to every specific offense which there was an attempt to prove, and which could be met by proof, the defendant may have established his defense, and yet upon the general evidence of continuous crime, which, in the nature of things, he could only meet by his personal denial, he may have been convicted. And how could he defend when he was not informed as to what particular offense, out of hundreds testified to by the prosecutrix, he was to be tried? Such a trial, upon a charge so indefinite as to circumstance of time or place, or any particular, except by the general designation, would be a judicial farce, if it were not something a great deal worse." (*People* v. *Williams, supra,* 133 Cal. at p. 168.)

Cal.Rptr. 352]; see also *People* v. *Jeff* (1988) 204 Cal.App.3d 309 [251 Cal.Rptr. 135], dis. and conc. opn. of Best, J., p. 345 et seq.) On the other hand, if the evidence of the molestations reveals "*any* specific act to support the charged crime," with the giving of the unanimity instruction or under an election as to which of the acts the prosecutor is relying upon to convict, there is no due process violation and the conviction stands as supported by substantial evidence. (*People* v. *Luna, supra,* 204 Cal.App.3d at pp. 739-746, original italics.)

In *Luna,* the defendant was charged in count VI with having committed child molesting under section 288, subdivision (a), by orally copulating the child "on or about and between August 1, 1982 and October 10, 1985," a period of over three years, in "a house on California Avenue" in Kern County. (*Luna, supra,* 204 Cal.App.3d at p. 739.) The evidence showed the offense must have occurred in the 21-month period between February 1983 and November 1984 because that was the time period during which the family lived on California Avenue. The 10-year-old child's testimony concerning count VI was detailed as to the nature of the acts at that location, the rooms in which they occurred, i.e., "his room or my room or the living room," and the different relative physical positions of herself and Luna, i.e., she standing and he lying down or she lying down and he in an undescribed position. (*Id.* at pp. 740-741.) There was no testimony as to a particular date during this 21-month period that any of the acts occurred. Nevertheless, *Luna* upheld the conviction of count VI against an assertion of the due process concern of *People* v. *Van Hoek, supra,* 200 Cal.App.3d 811.

In *Van Hoek,* there was no testimony about an event that could be connected with the date of any of the charges or if there was such testimony, it was devoid of any detail. (See *Luna, supra,* 204 Cal.App.3d at p. 742.) *Van Hoek* held under these circumstances even a unanimity instruction or an election by the prosecutor as to the particular act it was relying on to convict would not save the conviction. *Luna* held the "essence of this court's concern" in *Van Hoek,* i.e., "a failure to present evidence of *any* specific act to support the charged crime," was complied with as to count VI and there was substantial evidence to support that count in the face of the due process argument. (*People* v. *Luna, supra,* 204 Cal.App.3d at pp. 738, 743 and 749.)

Without extensive discussion, after setting forth the child's testimony, *Luna* reached the same conclusion as to counts VIII and X, relating to a two-month period as to which there was detailed testimony of a single molestation for each count. (204 Cal App.3d at pp. 730-731, 743-745.) *Luna* stated these two counts were not the subjects of the court's concern (*id.* at p. 738) and described the testimony as referring "to a specific act jurors may

unanimously agree upon as to time and place as being that charged in the information." (*Id.* at p. 746.) It is to be observed the only reference to a time of the crimes was that they "occurred on Miller Street where the family lived only two months." (*Id.* at p. 743.)

Here, as in *Luna,* the testimony of the 12-year-old C was detailed as to the nature of the acts of molestation, the specific locations of their occurrence and the relative physical positions of herself and Sanchez when the acts occurred during each period of the pertinent charge. The prosecutor established through C's testimony the terminology to be used in describing the various acts, that the acts took place in the garage or a bedroom of the house in which she lived, what was the nature of the acts, where and how the acts occurred in the garage in terms of a sofa bed there and the disrobing and relative physical positions of C and Sanchez. The molestations occurred in the afternoon and during the school year at about 2:30 p.m. when C returned home from school. The prosecutor then focused on the particular time period, starting with C's second grade semester from September 1982 to December 1982, and brought out the particular acts that occurred during that and each succeeding period, none of which exceeded five months.

In other words, there was in this case no "failure to present evidence of *any* specific act to support the charged crime." (*Luna, supra,* 204 Cal.App.3d at p. 742, original italics.) Accordingly, this case aligns with *Luna's* treatment of counts VI, VIII and X, and not with the *Van Hoek* line of cases where there was a failure to present evidence of any specific act to support the charged crime. *Luna,* we note, reversed the convictions in three additional counts based on its conclusion the evidence was generic in nature, for example, consisting of a statement by the child that the defendant did "it," without detailing what "it" consisted of on the day in question. (*Luna, supra,* 204 Cal.App.3d at p. 746.) Based on *Luna's* analysis, we do not view Sanchez's case as a "generic sex offense" case aptly described in *People* v. *Vargas, supra,* 206 Cal.App.3d 831, 845-846, as follows: "[T]here is a narrow class of cases within the category of resident child molester cases where neither an election nor a unanimity instruction addresses these due process concerns. This class of offense can best be described as a generic sex offense. In a generic sex offense case, the victim relates a series of identical acts that are not distinguished by any individualizing characteristic. For example, the victim testifies the defendant had sexual intercourse with her every other day in her bedroom, or that the defendant had sexual intercourse with her and did the same thing over and over. The numerous acts testified to cannot be distinguished from each other.

"In *People* v. *Van Hoek, supra,* 200 Cal.App.3d 811, we recognized the particular due process problems in the generic sex crime cases. The

'either/or' rule addresses the due process concerns set forth in *Castro* and *Williams* in those cases where, although evidence of several acts is presented, a distinguishing characteristic of the acts is also provided. (*Id.* at p. 816.) However, we held that, in the absence of a distinguishing characteristic, the 'either/or' rule fails to meet the due process concerns of notice, opportunity to formulate a defense and jury unanimity. (*Ibid.*)"

Having reached the conclusion the evidence in the case was sufficiently specific, we need not address Sanchez's *Van Hoek* argument or express our view on the subject. There was here detailed substantial evidence of a specific sexual act supporting each count charged for the time period relevant to that charge. Under the unanimity instruction given here, the verdicts are to be viewed as constituting a unanimous determination that Sanchez committed the act charged for each time period.[10] No deprivation of due process occurred in this case. (See also *People* v. *Atkins, supra,* 203 Cal.App.3d 15, 19; *People* v. *Vargas, supra,* 206 Cal.App.3d at pp. 842-847, 855, disavowing *Atkins* and *Luna* as "decided incorrectly," insofar as they categorize the "generic sex offense" evidence defect as a matter of a lack of substantial evidence barring retrial, but nevertheless following them and reversing five counts with retrial barred based on the generic sexual offense evidence conclusion; cf. *People* v. *Winkle* (1988) 206 Cal.App.3d 822 [253 Cal.Rptr. 726], holding no unanimity instruction is required even though numerous acts are brought out for a one count charge covering a three month period; see also *People* v. *Obremski* (1989) 207 Cal.App.3d 1346, 1353 [255 Cal.Rptr. 715], expressing the view that *Van Hoek, supra,* is incorrect.)

## VII

Sanchez contends the convictions on all counts alleging violations of section 288, subdivision (b), must be reversed since sufficient evidence of the element of duress was lacking. The contention is unmeritorious.

When the offenses began C was eight years old and in the second grade. During her testimony C once referred to Sanchez as her father, explaining

---

[10] We observe Sanchez developed the opportunity to attempt to impeach C by bringing out specific number estimates from her as to the frequency of the molestations. The large numbers she stated, usually more than 60 during each time period, permitted Sanchez to attack her credibility from the standpoint of the unlikelihood of the truthfulness of these large estimates when considering the acts occurred in a crowded house and were undetected for over three years.

Giving every intendment in support of the verdict, however, it is reasonable to conclude the jury rejected Sanchez's attempt to impeach C and instead, under the unanimity instruction given, unanimously believed he committed *all* the acts to which C testified. It is apparent a unanimous conclusion Sanchez committed all the acts includes a unanimous conclusion he committed the one act charged for each period. As we have seen, the evidence of the particular act was sufficiently specific.

that although she knew he was her grandfather, he has sometimes been kind of like her father. Many times Sanchez told her not to tell anyone and if she told anyone her mother would hit her. C repeatedly responded affirmatively to questions asking her if Sanchez would "make" or "require" her to perform the act in question, orally copulating him. Early in her testimony about the specific acts during the relevant time periods, C testified that during the first relevant time period of September 1982 to December 1982, every time there was a molestation Sanchez would "[p]ull my mouth on his weenie."

Considering Sanchez's status as a father figure in C's mind, his repeated threats that C's mother would hit her if she told anyone and the nature of his acts of physically pulling her and requiring her to perform the acts, there is substantial evidence of duress supporting the convictions of child molesting by duress. (See *People* v. *Pitmon* (1985) 170 Cal.App.3d 38, 51 [216 Cal.Rptr. 221]; *People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].)

## VIII

Sanchez contends the convictions under section 288, subdivision (a), in counts 6, 9, 12, 15, and 18 must be reversed since that crime is a lesser-included offense of the section 288, subdivision (b), charges in counts 7, 10, 13, and 19 which encompass the same conduct, and conviction of the greater offense precludes conviction of the lesser.[11]

Under *People* v. *Pearson* (1986) 42 Cal.3d 351 [228 Cal.Rptr. 509, 721 P.2d 595] or other case precedent there is no legal impediment under section 654 or otherwise to convicting a defendant of both crimes under section 288, subdivision (a), and section 288, subdivision (b), where as here the proof consists of different acts, touching the victim's genital area, constituting the crimes under subdivision (a) as compared to the acts, requiring the victim to orally copulate defendant, constituting the crimes under subdivision (b). Sanchez concedes the acts supporting the convictions differed. The different acts involved in these charges remove them from consideration as lesser-included offenses.

Since the fundamental premise of Sanchez's argument that the subdivision (a) offenses are lesser-included offenses of the subdivision (b) offenses fails, there is no basis for reversing the subdivision (a) convictions.

---

[11]Since the trial court set aside the conviction of count seven, Sanchez's argument as to count six being a lesser-included offense is mooted.

## IX

 Sanchez contends the jury was presented with an insoluble paradox when the trial court instructed that they could only find him guilty of the section 288, subdivision (a), offenses if they unanimously agreed he was not guilty of the greater offense under subdivision (b) of committing a lewd and lascivious act with duress. The argument derives from the court's having instructed the jury under CALJIC No. 17.12, relating to returning a partial verdict.[12] The argument also reflects Sanchez's misapprehension that the

---

[12] CALJIC No. 17.12, as given by the court, read: "The offense of committing a lewd and lascivious act upon a child is a lesser offense to the offenses charged in Counts VII, X, XIII, XVI, and XIX. Now I'll put it to you as simply as I can: 288(a) is a lesser-included offense of 288(b). That's because 288(b) has the element of duress, which 288(a) does not.

"In this case defendant is charged in the counts I just gave you—namely VII, X, XIII, XVI, and XIX—with the offense of committing a lewd and lascivious act by duress upon a child.

"I had to make a small change, but that's what the instruction will read when you get it.

"Now 'The Court will provide you with verdict forms for each count charged and for each lesser offense. You should determine whether defendant is guilty or not guilty of the offense of committing a lewd and lascivious act upon a child by duress. Now if you unanimously agree that defendant is guilty of said offense, then you will have your foreman date and sign the guilty verdict and return with it into this Court.'

"Nothing further would then be required of you as to these several counts which charge the lewd and lascivious acts with duress.

" 'However, if you unanimously agree that defendant is not guilty of these offenses, you will have your foreman date and sign the not guilty verdict for that crime, and then you will determine whether defendant is guilty or not guilty of the lesser offense of committing a lewd and lascivious act upon a child. If you unanimously agree that defendant is guilty or not guilty of said lesser offense, then you will have your foreman date and sign such guilty or not guilty form and return it into court together with a not guilty verdict on the offense of committing a lewd and lascivious act upon a child by duress.

" 'You will note from this instruction that you must unanimously agree that the defendant is not guilty of the greater offense before you may find the defendant guilty or not guilty of any lesser offense. If you are not able to unanimously agree on the greater offense, your foreman shall report such fact to the Court. If you unanimously agree that defendant is not guilty of the offense of committing a lewd and lascivious act upon a child by duress, but after due and sufficient deliberation, you cannot agree that defendant is guilty or not guilty of any lesser offense, your foreman shall report such fact to the Court and then return to the Court the signed not guilty verdict of the offense of committing a lewd and lascivious act upon a child by duress.

" 'You will note from this instruction that if you unanimously agree that defendant is not guilty of the offense of committing a lewd and lascivious act upon a child by duress, you must have your foreman date and sign such verdict and return it into court regardless of what may happen in your deliberations of any lesser offense.'

"Now I've dutifully read that instruction to you. Now I'm going to tell you what it says:

"On these counts which charge 288(b) you first determine, if you can, whether defendant is guilty or not guilty. If you find that he's guilty, then you simply use that form and bring it into court. If you are unable to agree as to whether he's guilty or not guilty, you report that to the Court. If you find that he's not guilty, then you date and sign that verdict form, and then you return to the second issue to determine whether he is guilty or not guilty of the lesser offense of 288(a). If you find that he is, you date and sign that verdict and bring it in. If you

lesser included offenses referred to were those in counts 6, 9, 12, 15 and 18, charging violations of section 288, subdivision (a). (See part VIII, *ante.*)

As given, the instruction related only to the greater and lesser offenses involved in the specific counts 7, 10, 13, 16 and 19, that is, lewd and lascivious conduct in connection with C orally copulating Sanchez either with duress (the greater offense) or without duress (the lesser offense). The instruction did not relate to the separate charges under subdivision (a) in counts 6, 9, 12, 15 and 18.

Accordingly, we conclude the jury was properly instructed on returning partial verdicts in connection with the subdivision (b) offenses and it was not presented with any insoluble paradox as a result of the giving of CALJIC No. 17.12.

## X

Sanchez contends instructing the jury on evidence of other offenses to show lewd disposition or intent constituted error since no such evidence was introduced for such a limited purpose and, in any event, such evidence to prove intent was inadmissible since his intent was never placed in issue.

The court gave CALJIC No. 10.35, reading: "Now '[*sic*] Evidence has been introduced for the purpose of showing lewd or lascivious acts' [*sic*] and acts of oral copulation '[*sic*] between the defendant and the child in question on . . . [*sic*] more occasions other than' [*sic*] those '[*sic*] charged in this case.

" '[*sic*] If you believe such evidence, you may use it only for the limited purpose of tending to show the defendant's lewd disposition or intent toward the child.

" '[*sic*] You must not consider such evidence for any other purpose.' [*sic*]"

As we have seen, there was evidence more lewd and lascivious acts occurred than those with which Sanchez was charged. Although the evidence was not expressly or at the time introduced for the limited purpose of showing Sanchez's lewd disposition or intent, it was evidence of other than the one act relevant to each charge and thus warranted some explanation. Here, the jury was told its use must be limited to showing Sanchez's lewd

find he is not, you date and sign that verdict and bring it in. If you can't agree, you report that to the Court."

disposition or intent toward C. To this extent, as a limiting instruction, the giving of CALJIC No. 10.35 benefitted rather than harmed Sanchez.

Sanchez points out, however, it has been held that where a defendant categorically denies any sexual involvement with the child he does not place his intent in issue. (*People* v. *Willoughby, supra,* 164 Cal.App.3d 1054, 1063.) Thus, Sanchez concludes, it was error to give the instruction.

Assuming Sanchez is correct in his conclusion of error because the instruction did not pertain to an issue in the case, he still does not demonstrate the error is prejudicial. He argues only that its cumulative effect with the "other errors" precludes a conclusion the error is harmless. With this argument we disagree. Considering that the thrust of the CALJIC No. 10.35 instruction was to Sanchez's benefit since it limited the use the jury could make of the evidence, and considering the strength of the evidence of his commission of the charged offenses, we conclude any error in giving CALJIC No. 10.35 is harmless.

## XI

Lastly, Sanchez argues the trial court's denial of his motion for a new trial constituted reversible error. The basis of this argument is that the trial court refused to consider a letter Sanchez's counsel represented he received after the jury returned its verdict. The court stated the letter was not an affidavit or declaration and it was not authenticated. The letter was from a Mario Escobar Lopez and said that he was dating C's mother in October 1985 (before C disclosed the offenses in January or February 1986) when she told him of her plan to take vengeance on Sanchez by causing C to accuse Sanchez of violating her. Sanchez's counsel told the court Escobar was in La Mesa prison in Tijuana, counsel had not been able to get to the prison to interview him and he believed he could if granted more time. The court did not rule on Sanchez's request for a continuance in order to interview Escobar.

Given the deficiencies in the verification and authentication of the letter as well as the showing in the record that Sanchez knew about Escobar early in the trial and had evidence about threats to Sanchez made before the investigation was launched, there was no abuse of discretion in the trial court's denial of Sanchez's motion for a new trial. (See *People* v. *Hill* (1969) 70 Cal.2d 678, 698 [76 Cal.Rptr. 225, 452 P.2d 329]; *People* v. *Williams* (1962) 57 Cal.2d 263, 270, 274 [18 Cal.Rptr. 729, 368 P.2d 353].)

## DISPOSITION

Judgment affirmed.

Kremer, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied March 30, 1989, and appellant's petition for review by the Supreme Court was denied June 1, 1989.