Filed 3/27/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERT WAYNE WILSON, JR.,<br><br>　　　Defendant and Appellant. | A150500<br><br>(Napa County<br>Super. Ct. No. CR175331) |

Defendant was convicted of 12 counts of lewd acts against a child, the daughter of his live-in girlfriend (Pen. Code, § 288, subd. (b)(1)),[1] and one count of continuous sexual abuse of the same child (§ 288.5, subd. (a)). He contends the trial court abused its discretion in admitting the testimony of his former wife, who testified he raped her, and of her son, who testified defendant sexually abused him when he was a young child; that the trial court abused its discretion in precluding medical testimony by defendant's expert witness and admitting testimony by the prosecution's expert about child sexual abuse accommodation syndrome (CSAAS) and false allegations of child abuse; and that it committed instructional error. In the published portion of this opinion, we conclude the trial court abused its discretion in admitting the testimony of a prosecution expert on child abuse, Dr. Anthony Urquiza, that studies show only a very small percentage of allegations of child sexual abuse are false. We also agree with defendant that the trial court erred in failing to instruct the jury that the section 228.5 count was an alternative to

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., II.B., II.D., II.E., II.F., and II.G.

[1] All undesignated statutory references are to the Penal Code.

the 12 counts of specific lewd acts.  In the unpublished portion of this opinion, we reject all but one of defendant's other contentions.  However, we find the trial court's errors harmless and affirm the judgment.

## I.  BACKGROUND

### A.  Procedural History

Defendant was charged with 12 counts for forcible lewd acts on a child under the age of 14 (§ 288, subd. (b)(1); counts 1 through 12) based on acts alleged to have taken place at various times between August 24, 2010 and August 23, 2012, and one count of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a); count 13) during the same time period and with respect to the same child, with allegations that he used force, violence, duress, menace, or fear and that he had substantial sexual conduct with the victim in connection with all 13 counts (§ 1203.066, subds. (a)(1) & (a)(8)).

Defendant's first trial ended in a hung jury, and the trial court declared a mistrial. In the second trial, the jury found defendant guilty on all counts and found as to each count that he had substantial sexual contact with the victim, L.D.

At the sentencing hearing, the trial court sentenced defendant to the upper term of 10 years for counts 1 through 4 and the midterm of eight years for counts 5 through 12, with all sentences to run consecutively, for a total prison term of 104 years.  The court dismissed count 13 as duplicative of the other counts.

### B.  Prior Sexual Offenses (Admitted Under Evid. Code, § 1108)

*1.  Nicole C.*

Defendant's former wife, Nicole C., testified that she first became sexually involved with defendant when she was 14 years old and he was 19 years old.  She became pregnant with someone else's child while she was 14, and began dating defendant again when she was about 15 and her son J.D. was a baby.  When J.D. was almost two years old, the three of them moved to Kansas.  They spent six months with defendant's sister in Independence, then moved to the city of Cherryvale.  Nicole was pregnant with defendant's child when they moved to Kansas, and gave birth to a son,

2

B.W., in January 2004.  Defendant and Nicole married when Nicole was 16 years old, before B.W. was born.

Defendant would often take care of the children while Nicole worked in the evenings, feeding and bathing them and getting them ready for bed.

When B.W. was a few months old, defendant began to be aggressive.  On one occasion he kicked Nicole off the bed and continued kicking her when she refused to have intercourse with him.  Another time, when she was trying to leave him, he pinned her against the wall, threw his wedding ring at her eye, and punched the wall next to her face.  On three occasions, he raped her.  The first rape took place in the bathroom, over the sink.  She did not recall the events that led up to it.  The second rape took place in the living room, while the children were present.  She did not want to have intercourse with him and he got angry; Nicole testified, "I didn't want to fight it again because I was so scared of the last time."  Nicole also testified that defendant raped her anally on one occasion, in their bedroom.

About six months after the assaults began, Nicole decided to end her relationship with defendant, and he moved out of the house.  Afterward, he wrote her a letter in which he told her he was sorry for raping her and an email that said, "I know I raped you and . . . I am sorry."  Nicole never reported the rapes to law enforcement.

Nicole left Kansas and returned to California when J.D. was "three, turning four."  She had noticed that J.D. was frightened at night and that he was worried defendant would come and kidnap him and B.W.

2.    *Assaults on J.D.*

J.D. was 15 years old when he testified in 2016.  He testified that B.W. was born when he was two and a half or three years old, and that he returned from Kansas to California when he was about five or six years old.  While they were living in Kansas, defendant watched J.D. when Nicole was working.

J.D. testified that the bathroom in the family's home in Kansas had a standing shower, and defendant bathed J.D. in the shower.  Defendant would get into the shower with J.D.  J.D. testified that defendant raped him in the shower when he was four or five

3

years old, by standing or squatting behind him and putting his penis in J.D.'s anus. It caused J.D. intense pain. This happened almost every time defendant showered with him. J.D. recalled a little bit of bleeding from his anal region and recalled having difficulty passing stools; he did not know if the problems were caused by the anal rapes or by his lactose intolerance. He sometimes had a hard time sitting as a result of the pain, and it was sometimes hard to sleep. Defendant told J.D. that if he told Nicole about it, J.D. would get into trouble, and defendant threatened to kill J.D., Nicole, and B.W.

After J.D. returned to California, he told a friend what had happened, but he asked her not to tell anyone. He did not tell Nicole until he was older. When J.D. was about nine years old, while he was temporarily living with grandparents in Washington State, he began seeing a therapist because he was getting increasingly angry and "didn't want to come out and do anything." He did not tell the therapist about the sexual abuse immediately; after the therapist continued asking him about what had happened in his past and what was aggravating him, J.D. found it overwhelming to "keep it in," and a week or two after he began therapy he revealed what had happened.

There were some inconsistencies with J.D.'s memories. He testified the shower in the Kansas house had a plastic door that pulled out and that once, when defendant was raping him in the shower, he hit the shower door so hard that he bent it, so that it came out of the seal at the bottom. In an interview that took place in 2011, when he was ten years old, he said he broke the door and ran away. The evidence showed, however, that the shower in the house in Cherryvale had a plastic shower curtain, not a door. About three feet away, a flimsy "pocket door," which rolled into the wall, led to J.D.'s bedroom.

In the 2011 interview, when he was ten years old, J.D. said that after the incident in which he broke the shower door, he ran to his room and locked it; he and B.W. climbed down from their second-floor window on a ladder outside; and J.D. rode his tricycle, with B.W. on his lap, to "where [his] mom was." At trial, however, he testified he did not recall those events, and Nicole testified he never visited her at work. J.D. testified that he recalled riding his bike with B.W. after one of the incidents in the shower, but did not recall going to Nicole's work.

4

Nicole never noticed any injuries on J.D.'s private parts, except one occasion when a bug bit him and caused swelling. She never noticed any blood on J.D.'s underwear. J.D. was no longer using diapers, and she did not inspect his anal area.

### 3. *The Investigation of J.D.'s Allegations*

A social worker in Washington State informed Deputy Nicol Dudley of the Napa County Sheriff's Department that J.D.'s therapist had reported the abuse. Defendant was living in Napa with his girlfriend, G.G., and her three daughters. He agreed to meet with Dudley. He told her he used to bathe J.D. in a shower and that he would get in the shower with J.D. when J.D. was younger. When Dudley told him J.D. said defendant had sexually assaulted him, defendant became angry, said, "That's crap," and walked out of the room.

G.G. testified that when she told defendant Dudley wanted to meet with him for this 2012 interview, he looked "frantic." When he came out of the interview, he was angry and told G.G. that L.D. was going to put him in prison.

At Dudley's request, G.G. brought her three daughters for an interview; they were ten, five, and two years old. The two-year-old was too young for Dudley to interview, and the five-year-old disclosed nothing of concern. Ten-year-old L.D. indicated that no one had touched her in a way she did not like, and she said nothing about defendant touching her inappropriately. Dudley did not ask specifically whether defendant had touched her. When asked whether there was anything she liked or disliked about defendant, L.D. did not disclose any abuse.

## C. The Crimes Alleged Against Defendant—Abuse of L.D.

L.D. was 15 years old in 2016, when she testified at trial. She testified that defendant began living with the family when L.D. was in second grade, that L.D.'s youngest sister, N., was the daughter of defendant and G.G., and that L.D. was about nine years old when N. was born.

One day around the end of L.D.'s second grade year, she was watching television with her mother, younger sister S., and defendant. She did not know if N. had been born yet, but the event occurred before the family moved from a downstairs to an upstairs

5

apartment when L.D. was in fourth grade. She was sitting on a couch with defendant, behind the others, who were on a mattress on the floor. Defendant took L.D.'s hand, put it in his lap, and put it down his pants against his genitals. L.D. did not tell her mother because she did not want her mother to break up with defendant and be sad again. On other occasions when the family was still in the downstairs apartment, defendant would look in a mirror in a bedroom that allowed him to watch L.D. in the shower. When she was ten years old, after they moved to the upstairs apartment, he would reach into the shower and try to touch her.

L.D. slept on a bottom bunk; she sometimes woke up during the night and found defendant standing next to her pillow. He would sit on the bed, pull his pants down, and tell her to put her mouth on his genitals. Defendant would hold her nose until she had to open her mouth, put his hands in her mouth, and tell her to put his penis in her mouth. He would grab the back of her head and her hair and move her to where he needed her to be. He would instruct her on what to do with her mouth and tell her she was doing it wrong. He would also touch her on her chest and put his mouth on her chest. On other occasions he would touch her vagina with his penis or put his fingers in her vagina, thrusting forward with his arm and causing her pain. He would insult her while he was doing this. On a few occasions, he ejaculated. He tried to put his penis in her vagina once or twice. The molestations occurred approximately weekly for years. L.D. thought they became more frequent as she grew older and entered puberty.

After the first molestation, L.D. told her mother that defendant had tried to kiss her, but otherwise she did not tell her mother what was happening.

L.D. was taken to speak with the sheriff's deputy in 2012, when she was 10 years old and in fifth grade. She heard her mother and grandmother talking about defendant doing bad things, and her mother was nervous. G.G. told L.D. she should answer the questions honestly and said she did not want defendant to go to jail.

L.D. testified that at that point, the things that defendant was doing seemed almost normal to her, "like, it was supposed to happen, like, it was my job to be there and do that for him," although she had begun to question whether they were wrong. She considered

6

telling the sheriff's deputy what was happening, but dismissed the idea. She did not tell anyone what had happened after she was questioned by the deputy, either. She testified that she said nothing because it was embarrassing, she did not want to upset anyone, and she did not want to draw attention to herself.

The abuse continued after L.D. was questioned by the deputy sheriff. Defendant moved out in 2013. L.D. became depressed in middle school and began seeing a therapist. She disclosed the abuse to the therapist in 2015. Shortly afterward, she spoke with a police detective about the abuse. She was embarrassed and nervous during the conversation and she did not tell him the whole truth about what had happened. The detective asked if defendant had ever put his penis in her mouth or his fingers in her vagina, and she told him no.

## D.    Expert Testimony of Dr. Urquiza for Prosecution

The prosecution presented the expert testimony of Dr. Anthony Urquiza, a professor of pediatrics and director of a child abuse treatment program at U.C. Davis Medical Center. Dr. Urquiza testified for the prosecution as an expert in child sexual abuse, suggestibility, false accusations, and the effects of abuse on children. He testified about traits or behavior sometimes exhibited by child victims of sexual abuse, known as CSAAS.

Dr. Urquiza explained that there were a number of myths about child sexual abuse. One of them is that a child who is sexually abused will immediately disclose the abuse. Others are that children who are being abused will show signs of distress, will stay away from the perpetrator, and can keep themselves safe from sexual abuse, and that most abuse is perpetrated by strangers. Dr. Urquiza testified that children may describe the basic facts of sexual abuse accurately, but as to other details their memory may be faulty or inconsistent. He also testified that some abusers target both boys and girls.

CSAAS has five elements: First, secrecy; that is, a child may keep the abuse secret because of the abuser's position of power, because of threats, because of a special relationship between abuser and child, or because of shame. Second, helplessness; that is, the child's inability to keep himself or herself safe. Third, entrapment and

7

accommodation, an element that can include dissociation, or children shutting down their feelings when they think of the abuse, and failing to show emotion when discussing it. Fourth, delayed and unconvincing disclosure; as an example, the initial disclosure may be vague, with more details revealed over time. And fifth, retraction or recantation of the allegation, which takes place in a minority of cases. Abused children may deny that the abuse is taking place when asked directly.

Dr. Urquiza explained that CSAAS is not a tool to determine whether a child has been abused, but is meant to explain to therapists the ways in which children respond to abuse when it occurs. He did not know the details of this case and offered no opinion on whether L.D. had been sexually abused.

Dr. Urquiza also offered testimony about false allegations of child sexual abuse, as discussed further below.

### E.     Defense Evidence

Defendant testified in his own defense and denied sexually abusing J.D. He said he was responsible for showering J.D. but that he never did anything inappropriate in the shower.

He denied having been violent with Nicole or raping her. He said that he and Nicole had had an agreement that if they had sexual intercourse before she went to work, he would not ejaculate inside her. On one occasion when they had intercourse three hours before she had to go to work, he failed to withdraw before ejaculating, and she was upset because she had to shower again and change before work. She referred to the incident as a rape, and in an effort to appease her and save their marriage he used the same term in his letter to her after they separated.

He testified he never sexually abused L.D. L.D. sometimes took long showers, and he once opened the bathroom and told her she needed to get out; when she yelled at him to get out of there, he said he would reach in and turn the water off. He never opened the shower curtain. He testified that L.D. sometimes tried to sit on his lap or run and jump on him, and that he would shoo her away because his work as a tattoo artist

8

caused him to be a germaphobe and he did not like physical contact.  He also testified he did not tell G.G. that L.D. would "put him in prison."

Defendant testified that L.D. did not sleep on the bottom bunk.

**F.      Expert Testimony of Dr. Coleman for Defense**

Dr. Lee Coleman, a psychiatrist, testified as an expert for the defense in the areas of childhood development, memory, suggestibility, and child sexual abuse investigations.

According to Dr. Coleman, people begin to form lasting memories at age three and a half or four, and it is difficult to determine whether these early memories fully reflect actual events or whether they are a combination of true events and matters that happen later or that the child hears from other people.

Dr. Coleman did not believe CSAAS was accurately described as a syndrome, which he described as a grouping of symptoms that suggests a particular diagnosis.  Each of the elements of CSAAS is equally consistent with true and false accusations.

Dr. Coleman also discussed the frequency of false claims of child sexual abuse, as further discussed below.

## II.      DISCUSSION

**A.      Evidence of Uncharged Prior Sexual Offenses**

*1.      Legal Principles*

Propensity evidence may be admissible in sex offense cases under Evidence Code section 1108, which provides in relevant part, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  (Evid. Code, § 1108, subd. (a).)

In considering whether evidence of prior sexual offenses is admissible as propensity evidence, trial courts "must engage in a careful weighing process under [Evidence Code] section 352.  Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to

9

the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.] . . . [T]he probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense. . . . [T]he prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term, ensuring that the jury would not be tempted to convict the defendant simply to punish him for the other offenses, and that the jury's attention would not be diverted by having to make a separate determination whether defendant committed the other offenses." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*People v. Cordova* (2015) 62 Cal.4th 104, 132 (*Cordova*).)

A lack of similarity between charged and uncharged offenses may be enough to justify exclusion of evidence of the uncharged offense, or even to compel its exclusion "where the uncharged offense has no tendency in reason to show that the defendant actually *has* the propensity whose proof the statute authorizes." (*People v. Earle* (2009) 172 Cal.App.4th 372, 397 [evidence of indecent exposure irrelevant to sexual assault charge].) However, subject to the limitations of Evidence Code section 352, dissimilarity alone does not compel exclusion of the evidence. " ' "[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." ' " (*Cordova*, *supra*, 62 Cal.4th at p. 133, *People v. Escudero* (2010) 183 Cal.App.4th 302, 311 (*Escudero*).) Moreover, where the uncharged crime is less

10

inflammatory than the charged offense, there is a reduced risk of prejudice. (*Cordova*, at p. 133.)

The court's ruling admitting the evidence is reviewed for abuse of discretion. (*Cordova*, *supra*, 62 Cal.4th at p. 132.)

2.      *Uncharged Offenses Against Nicole*

Defendant contends the trial court abused its discretion in admitting evidence that he raped and sodomized Nicole. He argues the conduct was different, in that Nicole, unlike L.D., alleged anal penetration and L.D. recalled only one or two instances of attempted vaginal rape; that a rape of a spouse does not show a propensity to abuse a child; that Nicole's testimony was highly inflammatory in its description of forcible sodomy and a rape in the presence of children; that the evidence of rape was strong compared to the evidence defendant abused L.D; that because Nicole's allegations did not result in a conviction, the jury might have its attention diverted and might seek to punish him for the earlier offense; and that the alleged offenses against Nicole were too remote in time.

We consider the admissibility of this evidence to be a close issue, but cannot conclude the trial court abused its discretion. Defendant is correct that there are factual differences between the claims made by Nicole and by L.D. However, "although lack of similarity is relevant to the court's decision whether to exclude Evidence Code section 1108 propensity evidence as more prejudicial than probative, that factor is not dispositive." (*People v. Merriman* (2014) 60 Cal.4th 1, 41–42 (*Merriman*).) And there is more similarity in the allegations than defendant acknowledges. With respect to both Nicole and L.D., there was evidence defendant took advantage of a member of his household. Although L.D., unlike Nicole, did not allege any anal rape, she testified that defendant tried to rape her. Nicole was older than L.D. at the time of the alleged rapes— apparently in her late teens—but L.D. testified that she thought defendant began molesting her more frequently when she entered puberty. Moreover, a difference in age is not dispositive. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 825–826 [evidence of prior sexual crimes against 12- and 13-year-old victims properly admitted in

11

case involving sexual assault and murder of 22-year-old]; *People v. Loy* (2011) 52 Cal.4th 46, 51, 54–55, 61–64 (*Loy*) [evidence of prior sexual crimes against 16-year-old girl and 32-year-old woman properly admitted in case charging defendant sexually assaulted and killed his 12-year-old niece]; *Escudero*, *supra*, 183 Cal.App.4th at pp. 306, 311 [evidence of uncharged acts against adult women had probative value in trial for molesting seven-year-old girl].)  And although defendant was not convicted of the prior assaults on Nicole, her allegations were not dramatically more inflammatory than the current allegations that he sexually molested a child regularly over the course of several years.  (Cf. *People v. Harris* (1998) 60 Cal.App.4th 727, 738, 740–741 [noting highly inflammatory nature of evidence of prior "violent and perverse attack on a stranger" in comparison to current case involving " 'breach of trust' sex crimes"].)  Moreover, he acknowledged in written communications to Nicole that he had raped her, so the evidence of the uncharged offenses is relatively strong.  (See *Falsetta*, *supra*, 21 Cal.4th at p. 917 [certainty of commission weighs in favor of admission of uncharged offense].)

Defendant draws our attention to *People v. Jandres* (2014) 226 Cal.App.4th 340 *(Jandres),* but it is readily distinguishable.  The appellate court there found the trial court had abused its discretion in admitting evidence, in a prosecution for forcible rape of an 18-year-old woman, that defendant had put his finger in the mouth of an 11-year-old girl.  Because of the difference in "the circumstances (daytime attempted burglary in one case, possible stalking and attack at night in the other); the ages of the victims (11 and 18); and the nature of the conduct (inappropriate touching of the mouth in one case, rape in the other)," the earlier offense did not support an inference that the defendant was predisposed to commit the rape.  (*Id.* at pp. 355–357.)  Defendant's conduct toward Nicole was not similarly ambiguous, and, although there was an age difference and a difference in defendant's relationship to the victims, the offenses against both took place in the privacy of the homes they shared with defendant.

The question before us is not whether the trial court could have *excluded* the evidence that defendant raped Nicole, it is whether the trial court abused its discretion in *admitting* it.  (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 [appellate court

will not disturb trial court's exercise of discretion under Evidence Code section 352 in absence of finding that decision was "palpably arbitrary, capricious and patently absurd"]; *Loy*, *supra*, 52 Cal.4th at p. 64 ["Because of the 'broad discretion' trial courts have under [Evid. Code,] section 1108 [citation], a finding of no abuse of discretion in one court's exclusion of evidence has no bearing on whether a different court abused its discretion in admitting evidence in a different trial"].) Bearing in mind our standard of review, we conclude defendant has not met his burden to rebut "the strong presumption of admissibility of the sexual assault crimes evidence under Evidence Code section 1108." (*Merriman*, *supra*, 60 Cal.4th at p. 42.)

3.      *Uncharged Offenses Against J.D.*

Defendant also challenges the admission of evidence of his assaults on J.D. He contends the acts were dissimilar: J.D. is a boy, and L.D. is a girl; and J.D., unlike L.D., alleged anal sodomy. These differences do not persuade us the evidence was inadmissible under Evidence Code section 1108. Both J.D. and L.D. were the children of defendant's spouse or cohabitant, he lived with both of them and helped to care for them, and there was evidence he sexually abused them while he was alone with them.

Defendant also argues J.D.'s account of events is unreliable because he was only three or four years old at the time of the abuse and was at a suggestible age; because his testimony contained factual inaccuracies, such as the presence of a shower door at the house in Cherryvale; and because he had previously recounted an inherently improbable narrative of climbing down a ladder with his one-year-old brother and taking his tricycle to his mother's workplace. As a result, he contends, it is not certain that he committed the offenses against J.D. at all. (See *Falsetta*, *supra*, 21 Cal.4th at p. 917 [listing among factors for trial court to weigh "the degree of certainty" of the commission of the uncharged offense].) Moreover, he argues, there was a risk the jury would seek to punish him for these unprosecuted acts.

Again, we are unpersuaded. The trial court could reasonably conclude that the heart of J.D.'s testimony—that he recalled defendant sexually abusing him in the shower when he was a young child—was sufficiently credible for the jury to consider, even if

13

there were inaccuracies in J.D.'s memory of details. (See *People v. Dennis* (1998) 17 Cal.4th 468, 524–526 [eight-year-old competent to testify about crime that occurred when she was four years old, despite gaps in her memory; trier of fact could evaluate credibility].)

We conclude the trial court did not abuse its discretion in admitting evidence of the uncharged sexual offenses against J.D.

*4.     Due Process Challenge*

Defendant also contends admission of the evidence of the uncharged offenses deprived him of due process of law. Our high court has upheld the constitutionality of Evidence Code section 1108 against a challenge that it violates due process. (*Falsetta*, *supra*, 21 Cal.4th at pp. 910–922; *Loy*, *supra*, 52 Cal.4th at pp. 60–61.) We are bound by these decisions. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)

## B.     Admission of CSAAS Evidence

Defendant contends the trial court abused its discretion and violated his constitutional rights when it admitted Dr. Urquiza's testimony regarding CSAAS. He argues the prosecution failed to establish the existence of the preconceptions that evidence of CSAAS would rebut, that Dr. Urquiza's testimony was more prejudicial than probative, that it constituted improper profile evidence, and that it rendered his trial fundamentally unfair.

A trial court generally has wide discretion to admit or exclude expert testimony, and we review its decision for abuse of discretion. (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 506; see *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited . . . Rather, it must be exercised within the confines of the applicable legal principles." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

14

The California Supreme Court has decided three cases that together establish the applicable substantive law. We briefly summarize these decisions before directly addressing defendant's claims. Of the three cases, one involves child sexual assault and the other two involve survivors of rape and domestic violence, but all three are instructive because our Supreme Court recognizes a "close analogy" between expert testimony on the behavior of victims for each of these crimes. (*People v. Brown* (2004) 33 Cal.4th 892, 905 (*Brown*).)

*McAlpin, supra,* 53 Cal.3d 1289 is a child molestation case in which the challenged testimony was admitted to explain the behavior, not of the victim, but of her mother. The Supreme Court found no fault with the admission of expert testimony to the effect that it was not unusual for a parent to refrain from reporting her own child's molestation, and giving reasons for such behavior. (*Id.* at p. 1299.) Citing with approval several Court of Appeal decisions allowing testimony of CSAAS, *McAlpin* explains that expert testimony on the common reactions of a child molestation victim is "admissible to rehabilitate [the child's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300.) Such " 'testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.) But this same testimony "is not admissible to prove that the complaining witness has in fact been sexually abused." (*Id.* at p. 1300.)

*McAlpin* discusses and follows the earliest of the three cases in this trio of Supreme Court decisions, *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*). (See *McAlpin, supra,* 53 Cal.3d at p. 1300.) In *Bledsoe*, the prosecution called a counselor who had treated a rape victim to testify that the woman suffered from rape trauma syndrome, which is an " 'acute stress reaction to trauma.' " (*Bledsoe, supra,* at p. 242.) Observing that "expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths," the

court nonetheless held that it was error to admit such evidence in Bledsoe's case, where it served no such purpose. (*Id*. at pp. 247–248.) The victim in *Bledsoe* "promptly reported the attack, immediately exhibited the type of severe emotional reaction that the normal lay juror would associate with rape and suffered bruises and other physical injuries that corroborated her claim that she had been violently assaulted." (*Id*. at p. 248.) Thus, the expert witness testimony served, "not to rebut misconceptions about the presumed behavior of rape victims, but rather as a means of proving—from the alleged victim's post-incident trauma—that a rape" had occurred. (*Ibid*.) This was a purpose for which the evidence was not admissible, the court held, as rape trauma syndrome was a "therapeutic tool" to help counselors assist victims, rather than a method developed and validated for forensic purposes. (*Id*. at p. 249; see *People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).)

The most recent case in the trio, *Brown*, *supra,* 33 Cal.4th 892, applies the logic of *Bledsoe* and *McAlpin* to a domestic violence case, holding that an expert witness may be called to explain why domestic violence victims "often later deny or minimize the assailant's conduct." (*Id*. at p. 895.) This expert testimony "cannot be admitted to prove the occurrence of the charged crimes," but is relevant to rebut "common notions about domestic violence victims akin to those" at issue in *Bledsoe* and *McAlpin*. (*Id*. at pp. 906–908.) The prosecutor need not hold this testimony until a rebuttal case, but may offer it as part of the case-in-chief as soon as independent evidence of the crime provides a sufficient foundation. (*Id*. at p. 908.) "Once there is evidence from which the trier of fact could find the charges true, evidence relating to the credibility of the witnesses becomes relevant and admissible." (*Ibid*.; see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*).)

The court in *Bowker* considered some practical aspects of how to apply *Bledsoe* in a manner that would provide the jury with relevant accurate information about a child's reaction to abuse, without causing the jury to use the information as a method of *predicting* abuse. First, the evidence "must be targeted to a specific 'myth' or 'misconception' suggested by the evidence," such as delay in reporting abuse or

16

recantation; conversely, "[w]here there is no danger of jury confusion, there is simply no need for the expert testimony." (*Bowker*, *supra*, 203 Cal.App.3d at pp. 394–395.) Second, the jury must be instructed that the expert's testimony should not be used to determine whether the victim's molestation claim is true, and must understand that "CSAAS research approaches the issue from a perspective opposite to that of the jury. CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience. [Citation.] The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Id*. at p. 394.)

Under these standards, we see no abuse of discretion in the admission of evidence of CSAAS. The complaining witness, L.D., waited several years before disclosing the sexual abuse, and at the time of the 2012 interview denied that anyone had touched her in a way she did not like. She disclosed more details over time, she omitted information during her 2015 interview and her testimony in the first trial, there were some inconsistencies in her descriptions of the abuse, and when testifying at trial she indicated she was revealing more than she had ever revealed previously. These facts could reasonably be expected to raise the question of whether her actions were consistent with abuse; indeed, defense counsel pressed L.D. on many of these points during cross-examination, thus putting at issue her credibility (See *Patino*, *supra*, 26 Cal.App.4th at p. 1745 [in case-in-chief, "prosecution should be permitted to introduce properly limited credibility evidence if the issue of a specific misconception is suggested by the evidence"]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735–736 (*Sanchez*) [CSAAS evidence properly admitted in case-in-chief where cross-examination attacked complaining witness's credibility]; *People v. Wells* (2004) 118 Cal.App.4th 179, 190 (*Wells*) [CSAAS testimony admissible because testimony of complaining witness showed she had not immediately reported alleged abuse and later provided piecemeal and contradictory disclosures].) Defense counsel also emphasized these facts during her closing argument: for instance, she argued that L.D.'s denial of abuse during the 2012 interview itself created reasonable doubt that her testimony was true, that L.D.'s

17

description of the abuse had changed over time, that her description of the family's sleeping arrangements was inaccurate, that she gave inconsistent descriptions of when defendant abused her and of the details of the abuse, that no one suspected the abuse when it was occurring, and that L.D. behaved normally around her family and friends. Dr. Uquiza's testimony was relevant to show these aspects of L.D.'s behavior were not inconsistent with abuse having taken place. Moreover, he testified that CSAAS is not a tool to determine whether a child has been abused, and he offered no opinion on whether L.D. had been abused.

This evidence and closing argument lead us to reject defendant's contention here that the prosecution had a duty to establish the continuing existence in potential jurors' minds of the myths and misconceptions the CSAAS evidence was intended to rebut. We find no error in the trial court's refusing his request for a contested hearing on the topic. Defendant argues that *Bledsoe*, *Bowker*, and *McAlpin* rely on outdated assumptions about how abused children act, and that current jurors—being familiar with widely publicized child sexual abuse scandals such as those involving Catholic priests or the Penn State football program—are not subject to the same misconceptions as jurors were in the 1980's or 1990's. But defendant's own use of behavior consistent with CSAAS as evidence that L.D. was *not* telling the truth shows the continuing propriety of admitting evidence of CSAAS. Defendant was able to argue at the hearing on the motions in limine that evidence of CSAAS was unnecessary and inappropriate in a courtroom, and he has failed to show the court was required to hold a further hearing on the existence of the myths the CSAAS evidence was intended to dispel.

In a closely related argument, defendant contends the expert testimony about CSAAS is inadmissible because it is unreliable scientific opinion under the *Kelly*/*Frye* test. (*People v. Kelly* (1976) 17 Cal.3d 24, 30, *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014.) Again, we disagree. "Under the *Kelly*/*Frye* test, when expert testimony based on a new scientific technique is offered, the proponent of the testimony must first establish the reliability of the method and the qualifications of the witness. 'Reliability of the evidence is established by showing "the procedure has been generally

18

accepted . . . in the scientific community in which it developed[,]" ' " (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448.) While the *Kelly/Frye* rule precludes admission of CSAAS evidence to prove a child has been abused, "such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse." (*Sanchez*, *supra*, 208 Cal.App.3d at p. 735; see *Bowker*, *supra*, 203 Cal.App.3d at pp. 390–393; *Wells*, *supra*, 118 Cal.App.4th at p. 188; see also *Bledsoe*, *supra*, 36 Cal.3d at p. 246 [discussing *Kelly/Frye* rule and concluding rape trauma syndrome is inadmissible to prove witness was raped but may be admissible to rebut misconceptions, e.g., that delay in reporting sexual assault is inconsistent with rape].)

Defendant contends that even if evidence of CSAAS was otherwise admissible, Dr. Urquiza's testimony as given was more prejudicial than probative because it was so consistent with L.D.'s version of events that it suggested to the jury that the abuse had actually occurred. (Evid. Code, § 352.) For instance, Dr. Urquiza testified that most sexual abusers of children know the child and have an ongoing relationship; that if abuse is carried out in an "incestuous-like" relationship such as that with a boyfriend or stepfather, the child may find it difficult to disclose the abuse; that a child may disclose abuse gradually after a vague initial disclosure; and that a perpetrator may enter a child's bedroom at night and abuse the child. Again, we are unpersuaded. Much of this testimony simply informed the jury of the behavior that characterizes CSAAS, something the courts have repeatedly held permissible. Dr. Urquiza explained that he did know any of the facts of this case, and he also explained that CSAAS was not a tool to determine whether a child had been abused. The trial court did not abuse its discretion in admitting this evidence.

Relying on *People v. Robbie* (2001) 92 Cal.App.4th 1075, defendant argues Dr. Urquiza offered improper profile evidence. The prosecutor there incorporated the victim's description of the defendant's conduct into hypothetical questions, and the expert responded that the behavior was typical of sex offenders. (*Id.* at p. 1084.) Our colleagues in Division Three of the First Appellate District concluded this constituted profile evidence, which was inadmissible to prove guilt. (*Id.* at pp. 1084–1085.) Here,

the expert testimony was offered in the context of explaining why a child *victim* might not report abuse, not to describe a typical *abuser*. Dr. Urquiza's testimony that when a child is sexually abused it is usually by someone the child knows, and his example of an abuser who comes into the child's room at night, are not sufficiently remarkable to render his testimony inadmissible profile evidence.

For all these reasons, we also reject defendant's contention that admission of the CSAAS evidence violated his right to due process by rendering his trial fundamentally unfair.

Finally, in order to preserve his rights on further review, defendant contends that *McAlpin* and *Bowker* were wrongly decided. As defendant recognizes, we are bound by the decisions of our high court. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.)

## C.    Statistical Evidence

After Dr. Urquiza testified about CSAAS, the prosecutor said: "I want to step outside of the accommodation syndrome briefly and talk to you about something we mentioned previously, false allegations."

Dr. Urquiza then testified that there was a limited amount of research on the topic of false allegations of child sexual abuse, but that false allegations occur "very infrequently or rarely," most often during a child custody dispute. He continued, "There are a number of studies that talk about the pressures put on children to make a false allegation. He referred to a "classic" Canadian study that found "about 4% of cases in which there was an allegation that was determined to be false," remarking that "[w]hat was notable [about the study] was that in none of those cases was it a child who made the allegation that was false, it was somebody else," such as a parent disputing custody.

On cross-examination, Dr. Urquiza testified that it was difficult to determine whether an allegation was false, but that the Canadian study was one of the best available. In the Canadian study, he believed, the determination that an allegation was false was made on a case-by-case basis after a follow-up investigation by the researchers who reviewed records from child protective services and law enforcement. Dr. Urquiza also testified there were 12 to 15 other studies on the subject, which found false

20

allegations in between one and six percent of cases.  Although the "classic" study found *no* children making false allegations of sexual abuse, he concluded that "it's better to say that false allegations do happen, because they do happen, but they happen very infrequently and rarely . . ."  He agreed it was possible for children to have false memories, but there was no data indicating false memories happened frequently.  And, in his own career, Dr. Urquiza had come across two cases in which a child alleged sexual abuse that he believed did not occur.

Defendant contends this numerical evidence improperly amounted to testimony that 96 percent (or between 94 and 99 percent) of children accusing a person of child molestation were telling the truth, and that this invaded the province of the jury in assessing a complaining witness's credibility.  No California case appears to have addressed this issue directly, but cases in other jurisdictions raise serious questions about the propriety of this type of evidence.

In *United States v. Brooks* (C.A.A.F. 2007) 64 M.J. 325 (*Brooks*), the defendant in a military court martial was charged with indecent liberties with a female under the age of 16.  (*Id.* at p. 326.)  An expert witness testified that the research indicated that between five and 20 percent of such allegations were false, and that the general sense was that in divorce cases, where purely fabricated allegations occurred most frequently, the frequency of fabricated accusations was two to five percent.  (*Id.* at p. 327.)  The appellate court concluded this "human lie detector" testimony "invaded the province of the court members to determine the credibility of the victim," because in effect he testified that there was "better than a ninety-eight percent probability that the victim was telling the truth," which went "directly to the core issue of the victim's credibility and truthfulness."  (*Id.* at p. 329.)  Its admission was therefore error, which the court found prejudicial.  (*Id.* at pp. 329–330.)  Following *Brooks*, the court in *United States v. Mullins* (C.A.A.F. 2010) 69 M.J. 113, 116, concluded that "[a]n expert inference that there is a 1 in 200 chance the victim is lying undermines the duty of the panel members to determine guilt beyond a reasonable doubt."

The court in *Brooks* relied on *Powell v. State* (Del. 1987) 527 A.2d 276 (*Powell*), in which the Delaware Supreme Court found erroneous the admission of an expert's testimony that "ninety-nine percent of the alleged victims involved in sexual abuse treatment programs in which she was also involved 'have told the truth.' " (*Id.* at p. 278; *Brooks*, *supra*, 64 M.J. at p. 329.) The court in *Powell* reasoned that the testimony "deprived [the defendant] of his right to have his fate determined by a jury making the credibility determinations, so clearly crucial in these cases, without guidance from an expert, in stark mathematical terms, bolstering the credibility of the complainant and thereby impugning his credibility. (*Powell*, at pp. 279–280; see *Wheat v. State* (Del. 1987) 527 A.2d 269, 274–275 [in providing "statistical evaluation of complainant's present veracity," expert "impermissibly invaded the credibility province of the jury in 'lie detector' fashion"].)

Similarly, in *Wilson v. State* (Tex.Ct.App. 2002) 90 S.W.3d 391, 393, an expert testified that the rate of false allegations of child sexual assault was between two and eight percent, and the majority of those were child custody cases. This testimony, concluded the appellate court, "went beyond whether the child complainant's behavior fell within a common pattern and addressed whether children who claimed to be sexually assaulted lie. [The] testimony did not aid, but supplanted, the jury in its decision on whether the child complainant's testimony was credible," and was error. (*Ibid*.)

Courts in other jurisdictions have reached similar conclusions. (See, e.g., *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, 737–739 (*Snowden*) [improper to allow expert testimony to boost credibility of alleged child victim with evidence that of 1,000 children expert had interviewed—including this child—995 told the truth]; *United States v. Magnan* (10th Cir. 2018) __ Fed.Appx. ___ [2018 U.S. App. LEXIS 33353, *10–11] [expert's testimony that studies found only two to four percent of children lie about sexual abuse is impermissibly credibility-bolstering]; *State v. Lindsey* (Ariz. 1986) 720 P.2d 73, 75 [expert's testimony that most people in the field feel only a very small proportion of incest victims lie held inadmissible]; *State v. Myers* (Iowa 1986) 382 N.W.2d 91, 92, 97–98 [evidence that a sexual abuse investigation program concluded

that perhaps one in 2,500 children who were interviewed did not tell the truth held inadmissible]; *State v. Parkinson* (Idaho Ct.App. 1996) 909 P.2d 647, 654 [evidence of national research estimating range of false allegations of sex abuse properly excluded as lacking foundation]; *Aguirre v. State* (Kan.App. 2016) 379 P.3d 1149 [expert testimony suggesting that 93 percent of children who recant allegations are lying when they do so inadmissible]; *State v. W.B.* (N.J. 2011) 17 A.3d 187, 201–202 ["Statistical information quantifying the number or percentage of abuse victims who lie deprives the jury of its right and duty to decide the question of credibility of the victim based on evidence relating to the particular victim and the particular facts of the case"]; *State v. Kinney* (Vt. 2000) 762 A.2d 833, 843–844 [error to admit expert testimony that false reporting occurred in only two percent of rape reports]; *State v. Catsam* (Vt. 1987) 534 A.2d 184, 186–188 [expert opinion that PTSD sufferers do not make up stories of child sexual abuse improper because "tantamount to a direct comment that the complainant was telling the truth about the alleged sexual assault for which the defendant was charged"]; see also *State v. MacRae* (N.H. 1996) 677 A.2d 698, 702 [testimony that between 70 and 80 percent of males treated for substance abuse had been sexually abused improperly provided statistical evidence victim probably had been abused]; cf. *State v. Morales-Pedrosa* (Wis. 2016) 879 N.W.2d 772, 778–780 [distinguishing *Brooks* and *Snowden* on ground that generalized statement that 90 percent of children claiming to have been abused are telling the truth was "less obviously objectionable than testimony that '99.5%,' '98%,' or even '92–98%' are telling the truth"]; but see *Alvarez-Madrigal v. State* (Ind.Ct.App. 2017) 71 N.E.3d 887, 892–893 [rejecting claim that expert testimony that some statistics show less than two or three children out of a thousand made up claims constituted improper vouching].)

Thus, it appears that the clear weight of authority in our sister states, the federal courts, and the military courts finds such evidence inadmissible. We find the reasoning of these cases compelling. Dr. Urquiza's testimony had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although Dr. Urquiza's testimony on this point was not

23

expressly directed to either L.D. or J.D., the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to "draw the ultimate inferences from the evidence." (*People v. Melton* (1988) 44 Cal.3d 713, 744; see *Wells*, *supra*, 118 Cal.App.4th at p. 189 ["Jurors are generally considered to be equipped to judge witness credibility without the need for expert testimony"]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39–40 [veracity of those who report crimes to the police not a proper subject for expert testimony].)

Although we doubt that any study can accurately capture the prevalence of false accusations of child sexual abuse, our concern about this statistical evidence is more fundamental. Even assuming one could determine that only one to six percent of sexual abuse allegations are false, that fact would not be helpful to the jury because it tells the jury nothing about whether *this particular allegation* is false. Are L.D. and J.D. in the four percent or in the 96 percent? The jury must evaluate their testimony, together with all the other evidence, to decide this question, and it should do so without statistical evidence placing a thumb on the scale for guilt. (See *People v. Collins* (1968) 68 Cal.2d 319, 331 [evidence of mathematical likelihood of any random couple possessing distinctive features of perpetrators of crime would not bear on defendants' guilt because of statistical likelihood other couples also share those features]; *People v. Stergill*, *supra*, 138 Cal.App.3d at p. 40 [officers' opinions of child's truthfulness "did not have a *reasonable* tendency to prove or disprove [child's] credibility and were therefore not relevant"].) The statistical evidence was not relevant, and its admission was more prejudicial than probative. Admitting Dr. Urquiza's statistical evidence was an abuse of discretion.

We next consider whether the admission of the statistical evidence was prejudicial. Defendant argues he was deprived of his federal constitutional rights to trial by jury, to a fair trial, to the presumption of innocence, to conviction only upon proof beyond a reasonable doubt, to due process of law, and to present a defense. He therefore urges us to apply the *Chapman* standard of prejudice, under which we reverse unless the error is

24

harmless beyond a reasonable doubt. (*Chapman v. Cal.* (1967) 386 U.S. 18, 24.) In similar situations, however, our high court has applied instead the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, under which we reverse only if it is reasonably probable the defendant would have reached a more favorable result in the absence of the error. (See *Bledsoe*, *supra*, 36 Cal.3d at pp. 251–252 [applying *Watson* standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped]; *Collins*, *supra*, 68 Cal.2d at pp. 331–332 [applying *Watson* standard where " 'trial by mathematics' distorted role of jury"]; see also *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "].) We will apply the same standard here.

Under the *Watson* standard, we conclude there was no prejudice. Dr. Urquiza's testimony on the statistical evidence was brief. He acknowledged that it was difficult to determine whether an allegation was false and that he himself had come across two cases in which he believed a child he was treating was making a false allegation of sexual abuse.

Moreover, defendant was able to rebut the statistical evidence through his expert witness, Dr. Lee Coleman, who testified that the four percent number reflected only the cases in which there was positive proof a child's allegations were false, and that there was no way to know the actual ratio of true to false allegations. Dr. Coleman pointed out that there are many examples of false memories—including cases in which the memories of large numbers of children had been influenced by adults investigating alleged crimes or in which allegedly recovered memories of Satanic ritual abuse had been debunked— and that interviewers in child abuse investigations often use unreliable methods. Dr. Coleman also acknowledged that it is rare for children to make up false accusations of abuse purposefully, explaining that false accusations are more likely to be the result of outside influences. Although the prosecutor pointed out in her closing argument that no one was trying to get L.D. to lie, there was no custody battle, and even Dr. Coleman testified children rarely lie about sexual abuse, she did not mention the statistical

25

evidence. And the jury was instructed that it was the sole judge of the facts and the credibility of witnesses.

Here, where both L.D. and J.D. testified extensively and the jurors could assess their credibility, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony, we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony.

**D.     Exclusion of Dr. Coleman's Testimony Regarding J.D.'s Injuries**

In another challenge to the trial court's rulings on expert evidence, defendant contends the court abused its discretion and violated his constitutional right to present a defense when it refused to allow his expert witness, Dr. Coleman, a medical doctor, to testify about the injuries that a young child would receive from anal sodomy.

In defendant's first trial, Dr. Coleman testified that a three-year-old who was sodomized would suffer acute injuries, including muscle tearing, bleeding, and severe pain for at least a week, and would need care in an emergency room. It would be impossible for an adult caring for the child not to notice the injuries. A forensic nurse testified in rebuttal that anal penetration could result in a range of symptoms, including redness, swelling, a fissure, a laceration, an abrasion, or a hematoma, but that it was also possible that there would be no damage.

In the second trial, the prosecution sought to exclude Dr. Coleman's testimony on this point. During a hearing under Evidence Code section 402, Dr. Coleman testified that he attended medical school from 1960 to 1964, followed by a one-year pediatric internship, then received specialty training in adult and child psychiatry from 1965 to 1969. He had reviewed hundreds of reports of physical examinations of alleged child sexual abuse victims, often provided by attorneys representing clients accused of molesting a child. He had written two articles, in preparation for which he had reviewed research in the field of sexual abuse injury. The most important study was a 1990 publication by Dr. John McCann, who concluded that many of the physical findings that were associated with claims of child abuse were also present in children who had not been abused; many other researchers had reached similar conclusions. During medical

26

school and his internship, Dr. Coleman physically examined many children. He did not recall having examined a child who claimed to have been sexually abused. He testified that a young child who was sodomized would suffer some bruising and possibly some surface lacerations; in severe cases, there might be injuries or tears to the muscles. The child would experience pain for several days, although the extent of the pain would depend on the severity of the injuries. Caregivers of a child who had been sodomized would almost certainly notice something was wrong because the child might avoid sitting and might not walk in a normal manner.

The trial court did not allow Dr. Coleman to testify before the jury about physical injuries resulting from sexual abuse, concluding, "He has background in psychology and anything that related to that and his experience there obviously is admissible. But what to expect on an injury I think there has to be some background of experience dealing with patients of similar age and with some kind of complaint, and we have no background in that at all. I think it has to be something more than just studying reviews."

"Evidence Code section 720, subdivision (a) allows a witness to testify as an expert 'if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' . . . [A]n expert's qualifications 'must be related to the particular subject upon which he is giving expert testimony. Qualifications on related subject matter are insufficient.' " (*People v. Chavez* (1985) 39 Cal.3d 823, 828.) We review a trial court's decision on the admissibility of expert evidence for abuse of discretion. (*People v. Watson* (2008) 43 Cal.4th 652, 692; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001.)

We see no abuse of discretion here. It appeared that Dr. Coleman had not examined a child for more than 50 years, and he did not recall ever examining a child who claimed sexual abuse. He had spent his career as a psychiatrist. Although he had read reports of child abuse cases in connection with his work, the trial court could reasonably conclude there was no showing his expertise extended to the injuries a child would suffer through anal sodomy.

27

Defendant contends this conclusion falls foul of the California's liberal approach to allowing medical doctors to testify about matters in specialties other than their own. In *Cline v. Lund* (1973) 31 Cal.App.3d 755, 766, cited by defendant, the court held that a clinical professor of pathology who frequently made rounds and consulted with gynecologists, worked in operating rooms and advised gynecologists on what to do, and had examined post-surgery cases to determine the cause of hemorrhages, should have been allowed to testify on the standard of care of a gynecological surgeon. In *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 37–39, overruled on other grounds in *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 543, our high court concluded a doctor with a diplomate in surgery and neurosurgery, who presumably regularly read X-rays and radiologists' reports, was competent to testify about the standard of care in reading X-rays, in submitting X-ray reports, and in diagnosis.

Dr. Coleman's background does not meet the standards of these cases. Although he was a medical doctor, he had no first-hand experience with examining or treating injuries caused by sexual abuse. The research he reported studying while preparing his articles concluded that many physical phenomena treated as signs of abuse—such as small changes in the genital or anal area—were also present in children who had not been abused.[2] Nothing in his background compels a conclusion that he has expert knowledge that young children who have been sodomized would suffer severe injuries. We find no abuse of discretion in the trial court's decision to exclude this testimony.

Even if the evidence should have been admitted, we see no prejudice. Although Dr. Coleman testified in the first trial that a three-year-old who was sodomized would suffer acute injuries, including muscle tearing, and would need emergency care, his proffered testimony in the second trial was more muted. In that trial, he indicated he

---

[2] Dr. Coleman testified that he had never been a full-time faculty member of any university, and he had never had any articles on child sexual abuse published in an official publication of the American Psychology Association, the American Medical Association magazine, or the American Journal of Forensic Psychiatry. His articles appeared in Hustler magazine, Chic magazine, and Gallery magazine, none of which are professional peer reviewed journals.

would testify that anal sodomy of a young child would result in bruising and might cause lacerations or external bleeding, and that the child would be in pain and might avoid sitting. Although Nicole did not notice any such injuries, these symptoms are consistent with what J.D. testified he suffered.

We also reject defendant's constitutional claim that he was denied his right to present a defense. Application of the ordinary rules of evidence generally does not impermissibly infringe on the defendant's constitutional right to present a defense. (*People v. Lawley* (2002) 27 Cal.4th 102, 155; *People v. Cunningham* (2001) 25 Cal.4th 926, 998.) The trial court reasonably concluded Dr. Coleman was not an expert on the physical injuries caused by sodomy, and defendant was able to elicit evidence supporting his position that J.D.'s accusations were false through evidence that Nicole never saw blood on J.D.'s underwear or observed any injuries when she bathed him.

**E.    Exclusion of Dr. Coleman's Responses to Hypothetical Questions**

Defendant contends the trial court abused its discretion precluding his counsel from asking Dr. Coleman hypothetical questions that closely tracked the evidence in this case.

Before trial, the People moved in limine to exclude any hypothetical questions that asked Dr. Coleman to render an opinion about the specific facts of the case. The trial court ruled that defense counsel could not ask Dr. Coleman about the facts of the case, and indicated that it would be inclined to sustain objections to hypothetical questions based on the direct facts of the case. During trial, while questioning Dr. Coleman about proper investigations of child abuse allegations, defense counsel began a question, "Hypothetically if a 10 year old boy disclosed abuse that had happened to him between the ages of three and five and detailed being sodomized in the shower—" The trial court sustained the prosecutor's objection on the ground the question was based on the facts of the case. Defense counsel then asked, "[I]f there's an allegation that the child broke down a shower door while being abused, is it important to investigate whether or not

29

there was a shower door and whether or not it was broken down?" The trial court sustained the prosecutor's objection.

Defendant contends theses rulings were improper under *People v. Vang* (2011) 52 Cal.4th 1038, 1041, in which our high court held it was proper for hypothetical questions to an expert witness to be based on the evidence in a case and to track that evidence closely. The Attorney General concedes the trial court should have allowed hypothetical questions that mirrored the facts of the case. We agree that *People v. Vang* is dispositive on this point.

However, defendant has not shown prejudice. It appears that in the first trial, defendant was allowed to ask questions similar to those that were barred at the second trial. In response to the question in the first trial, "[H]ypothetically, if a ten-year-old boy disclosed abuse that happened to him between the ages of three and five and gave great detail about being sodomized in the shower, what issues would be important for the investigator to look at?" Dr. Coleman replied that one would want to investigate the child's injuries and provided the testimony we have already discussed about the severe injuries and need for emergency care such a child would suffer. We have already concluded, however, that the trial court did not abuse its discretion in limiting Dr. Coleman's expert testimony on this point. And defendant was able to elicit testimony that Nicole did not notice any suspicious injuries on J.D. As to the question of J.D. kicking down the shower door, the prosecutor conceded that the house in Cherryvale had a shower curtain, not a shower door, and defendant was able to argue that the inconsistencies in J.D.'s recollections called into question the reliability of his memories.

Defendant argues, however, that the trial court's ruling prevented him from pursuing lines of questioning regarding specific deficiencies of the investigation that he carried out at the first trial, such as the need to investigate the layout of the house in which L.D. lived, the failure to conduct a detailed interview with G.G., and the failure to investigate whether any medical records corroborated L.D.'s assertion about a physical altercation between herself and defendant. Again, he has not met his burden to show prejudice. Even without asking questions in a hypothetical format, defendant was able to

30

elicit Dr. Coleman's opinion about proper methods of interviewing those who report child abuse. But when the prosecutor objected to defense counsel questioning Dr. Coleman about the shower door, the trial court indicated not only that it would sustain objections to case-specific hypothetical questions, it *also* accepted the objection that Dr. Coleman had not been qualified as an expert on what police officers should do in response to allegations of child abuse. Defendant has not shown that, even if the court had allowed hypothetical questions tailored to the facts of the case, he would have—or should have—been allowed to elicit from Dr. Coleman testimony about proper police procedure, or that any such testimony would have brought about a more favorable result.

Defendant also contends he was denied his constitutional right to present a defense. We reject this contention. "[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.)

We conclude defendant has not shown he was prejudiced by the exclusion of hypothetical questions, either standing alone or cumulatively with the erroneous admission of the statistical evidence.

## F.    Instruction on Uncharged Offenses

The trial court gave the jury the following instruction on how to consider uncharged offenses: "The People have presented evidence the defendant committed the crime of lewd and lascivious acts that were not charged in this case. This crime is defined for you in these instructions. You may consider [] this evidence only if the People prove by a preponderance of the evidence that the defendant in fact committed the charged offense. [¶] . . . If the People have not met this burden of proof you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged [offense], you may, but are not, required to conclude from the evidence the defendant is disposed or inclined to commit sexual offenses and based upon that decision also conclude the defendant is likely to commit Penal Code section 288[(b)](1) and Penal Code section 288.5(a) as charged here." This instruction, based on CALCRIM No. 1191,

31

referred only to the uncharged offenses against J.D.; it made no mention of the rapes to which Nicole testified.[3]

Defendant contends that, because the instruction did not identify rape, the crime Nicole alleged, and did not identify the elements of rape, it was erroneous and the error requires reversal. As defendant acknowledges, a court does not have a sua sponte duty to instruct the jury on the admissibility or use of evidence of prior crimes. (*People v. Cottone* (2013) 57 Cal.4th 269, 293.) However, he points out, if a court chooses to instruct on a legal point, it must do so correctly. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)

Although defendant seeks to paint the instruction as *incorrect*, in fact he points to nothing in it that does not accurately state the law. Rather, the gravamen of his complaint is that it is *incomplete* in not including the standards for evaluating Nicole's testimony. But he made no objection on this ground at trial, and it is well established that " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jones* (2013) 57 Cal.4th 899, 969; accord, *People v. Lee* (2011) 51 Cal.4th 620, 638.)

Defendant's reliance on *Jandres*, *supra*, 226 Cal.App.4th 340, is unavailing. The instruction there identified attempted kidnapping as the uncharged sex offense from which the jury could conclude the defendant was inclined to commit sexual offenses. (*Id.* at p. 358.) The appellate court found the instruction erroneous: attempted kidnapping was not a sexual offense within the meaning of Evidence Code section 1108, and the evidence of an uncharged sex offense was admissible only as a potential violation of section 647.6, annoying or molesting a child. However, the instruction made no mention of that provision and did not identify its elements. (*Ibid*.) Thus, the instruction misidentified the uncharged crime. The instruction here, on the other hand, correctly

---

[3] Nicole did not testify at defendant's first trial. It appears the court and the parties used the instructions from the first trial as their model in the second trial and did not modify CALCRIM No. 1191 to reflect Nicole's testimony.

identified the uncharged crime to which J.D. testified and drew the jury's attention to its elements.

Because the instruction was a correct statement of the law and responsive to the evidence J.D. provided, the trial court was under no sua sponte duty to amplify or extend it in the absence of a request.

## G.     The Court's Comments During Closing Argument

Defendant contends the trial court improperly instructed the jury during the following portion of his closing argument:  "[Defense counsel:]  What I would suggest you do with [the] evidence [of offenses against J.D. and Nicole] is first look at [L.D.] alone.  Look at her testimony, her statements and consider them alone without thinking about [J.D.] and Nicole's allegations.  And if you just look at what [L.D.] is saying you have to decide whether or not you would convict Mr. Wilson.  If the answer is no you never get there.  You never consider [L.D.] [*sic*] and [J.D.'s]—"  The prosecutor objected on the ground the argument "[m]isstates the jury's job," and the trial court stated, "It's an approach.  I have instructed, the jury should consider my instructions on it and I'll let counsel make her argument."  Defense counsel continued, "The jury instructions are clear that the sole basis for you to convict Mr. Wilson cannot be those uncharged offenses with Nicole and [J.D.].  So if you would convict, maybe you're not sure, yes, then that's when Nicole and [J.D.'s] accusations come into play.  But if you're not convinced just by [L.D.'s] allegations, you cannot use Nicole and [J.D.] as the sole reason to convict Mr. Wilson."  The trial court interjected, "*I think that's incorrect, counsel.  Why don't you move on?*"  (Italics added.)  Defense counsel said she would "back up to clarify," and continued, "When we're looking at CALCRIM 375 if you conclude that the defendant committed the uncharged offenses that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself.  That means it can't be the sole basis.  If you don't believe [L.D.] you cannot convict Mr. Wilson simply because you believe what happened with [J.D.] and Nicole."

Defendant contends his counsel's original argument stated the law correctly and that by contradicting her, the court in effect misinstructed the jury.  We disagree.  The

33

sentence that provoked the trial court to intervene was not a model of clarity, but in context it suggested that if the jury was "not convinced just by [L.D.'s] allegations," then it could not consider Nicole and J.D.'s testimony. This argument misstates the proper use of other crimes, which is not limited to being considered *after* the jury has already decided a defendant is guilty. (See Evid. Code, § 1108; *Falsetta*, *supra*, 21 Cal.4th at p. 911 [Evid. Code, § 1108 intended to allow trier of fact to be made aware of defendant's other sex offenses in evaluating victim's and defendant's credibility].) The trial court did not err in admonishing defense counsel, and she was able to point out that the prior offenses could not be the sole basis to convict defendant of the current offense. There was no error.

## H.    Dual Convictions

Defendant contends the trial court erred in failing to instruct the jury it could not convict him of both continual sexual abuse of L.D. (§ 288.5) and the individual specific lewd and lascivious acts against her (§ 288, subd. (b)). Section 288.5, subdivision (c) provides in relevant part that "[n]o other act of . . . lewd and lascivious acts, as defined in Section 288, involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative." The information did not comply with this limitation: Defendant was charged in count 13 with continuous sexual abuse of a child, L.D. (§ 288.5, subd. (a)) between August 24, 2010 and August 23, 2012, and in counts 1 through 12 with lewd acts with L.D. (§ 288, subd. (b)(1)) at various times during the same time period, and the counts were not charged in the alternative.[4]

The trial court rejected defendant's request to instruct the jury that it could not convict him of both continuous sexual abuse and the specific offenses, concluding that if the jury convicted defendant of both charges, the continuous sexual abuse count could be

---

[4] At the first trial, the prosecutor indicated she would amend the information orally to charge count 13 in the alternative to counts 1 through 12. Nevertheless, the jury was not presented with these counts as alternate charges in the second trial.

vacated. The jury convicted defendant of all charges. The trial court sentenced him for counts 1 through 12 and dismissed count 13. The Attorney General concedes that count 1 through 12 and count 13 should have been charged in the alternative and that dual convictions were improper.

Our high court has ruled that where a defendant is erroneously convicted of both continuous sexual abuse and individual sexual offenses against a child taking place during the same time period, "either the continuous abuse conviction or the convictions on the specific offenses must be vacated." (*People v. Johnson* (2002) 28 Cal.4th 240, 245, 248 (*Johnson*); see *People v. Torres* (2002) 102 Cal.App.4th 1053, 1057 (*Torres*).)

This rule was explored further in *Torres*. In violation of section 288.5, subdivision (c), the defendant was convicted of continuous sexual abuse and multiple felony sex offenses against the same victim. (*Torres*, *supra*, 102 Cal.App.4th at pp. 1059–1060.) Our colleagues in Division One of the First District Court of Appeal concluded that the appropriate remedy, "in deciding which convictions to vacate as the remedy for a violation of the proscription against multiple convictions set forth in section 288.5, subdivision (c) [was to] leave appellant standing convicted of the alternative offenses that are most commensurate with his culpability." (*Id.* at p. 1059.) The jury convicted Torres of ten separate felony sex offenses and one overlapping count of continuous sexual abuse. (*Id.* at pp. 1059–1060.) "Because of the number and severity of these specific offenses, appellant faced a greater maximum aggregate penalty with respect to these than he did on the continuous sexual abuse offense," leading the court to conclude "the appropriate remedy [was] to reverse the conviction for violating section 288.5." (*Id.* at p. 1060.)

The trial court here adopted the remedy contemplated in *Torres*. Defendant argues that the court should instead have sentenced him only on the continuous sexual abuse count and dismissed the twelve lewd act convictions. He points out that in *Johnson*, our high court affirmed an appellate court decision that vacated the individual sexual offense convictions, rather than the single conviction for continuous sexual abuse; and he argues that the procedure the trial court followed unfairly allowed the prosecutor to avoid the risks entailed by charging in the alternative. In *Johnson*, however, the court was not

35

presented with the question of whether a court could properly vacate the continuous sexual abuse conviction rather than the convictions for specific offenses. And *Torres* explains that in the case of dual convictions, the court should leave the defendant convicted of the offense most commensurate with his culpability. (*Torres*, *supra*, 102 Cal.App.4th at pp. 1059–1060.) Here, the trial court considered defendant's request to be sentenced for the single continuous sexual abuse count rather than the 12 specific offenses and explained its reasons for choosing the high term for four of those counts, including the pattern of continuing offenses, the abuse of trust, the use of violence, and the fact that defendant continued abusing L.D. after the police confronted him about his earlier abuse of J.D

We emphasize that the trial court should have instructed the jury that it could not convict defendant both of continuous sexual abuse and the specific offenses, and we do not condone the procedure adopted here of planning in advance to vacate any dual convictions. However, the verdicts show that the jury in fact found that defendant committed all 12 specific lewd acts that were alleged. We see no likelihood that, if properly instructed, the jury would not have convicted defendant of counts 1 through 12. Nor can we fault the trial court's conclusion that the convictions of counts 1 through 12 were most commensurate with defendant's culpability. To vacate these convictions, based simply on the trial court's procedural mistake in failing to instruct that section 288.5 was an alternative to counts 1 through 12, would give defendant an unjustified windfall.

Defendant's reliance on *People v. Jaramillo* (1976) 16 Cal.3d 752 (*Jaramillo*), does not persuade us otherwise. In *Jaramillo*, our high court concluded a defendant could not be convicted of both unlawful driving or taking of a motor vehicle (Veh. Code, § 10851) and receiving stolen property (§ 496)—the same motor vehicle—because the unlawful driving or taking offense could encompass theft of the vehicle, and a person may not be convicted of both stealing and receiving the same property. (*Jaramillo,* at p. 754.) In light of the uncertainty as to whether the Vehicle Code section 10851 conviction represented defendant taking, or simply driving, another's vehicle, the court

reversed the convictions and remanded to allow the People to retry one or both counts or, if the People did not do so, for the trial court to reinstate the Vehicle Code section 10851 conviction only. (*Jaramillo,* at p. 760.) Here, there is no confusion about the factual basis for defendant's convictions. We conclude *Torres* supplies the correct remedy for a violation of section 288.5, subdivision (c).

### III. DISPOSITION

The judgment is affirmed.

_____

TUCHER, J.

WE CONCUR:


_____

POLLAK, P. J.


_____

BROWN, J.

Trial Court:                        Napa County Superior Court

Trial Judge:                        Hon. J. Michael Byrne

Counsel for Appellants:             Laura S. Kelly, by Court-Appointment under
                                    the First District Appellate Project Independent
                                    Case System

Counsel for Respondents:            Xavier Becerra, Attorney General; Gerald A.
                                    Engler, Chief Assistant Attorney General;
                                    Jeffrey M. Laurence, Senior Assistant Attorney
                                    General; René A. Chacón, Supervising Deputy
                                    Attorney General; David M. Baskind, Deputy
                                    Attorney General